**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN LOCKETTE,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY & CO. LLC., MORGAN STANLEY SMITH BARNEY LLC, and MORGAN STANLEY,<br><br>Defendants. | Case No. ____________<br><br>Jury Trial Requested |

## COMPLAINT

Plaintiff John Lockette ("Plaintiff"), by and through his attorneys, Stowell & Friedman, Ltd., hereby files this Complaint of racial discrimination and retaliation against Defendants Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley (collectively "Defendant," "Morgan Stanley," or "the Firm"), and states as follows:

## JURISDICTION AND VENUE

1. Plaintiff's claims arise under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b). Defendant is headquartered and maintains a number of branch offices in this District and services clients who are residents of this District. Defendant set forth policies and practices that intentionally discriminated against African Americans from its New York headquarters.

**PARTIES**

3. Morgan Stanley is a publicly traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and headquartered in New York. Morgan Stanley is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant. The Firm employs over 16,000 registered brokers, called Financial Advisors ("FAs"),[1] who provide wealth management services and serve as the face of Morgan Stanley to its individual and institutional clients. In 2014, Morgan Stanley's wealth management business managed $2 trillion in client assets, and achieved a 20% profit margin.

4. Plaintiff John Lockette is an African American man who resides in New Jersey. Plaintiff was a successful FA at Merrill Lynch when Smith Barney recruited him to join the Firm in 2001. Plaintiff continued his career at Smith Barney as an FA until early 2007, when he was invited to join the Firm's management as a Regional Planning Specialist. The Firm required Plaintiff to transfer his book of business to other FAs in order to enter management. In 2009, Smith Barney merged with Morgan Stanley and reduced the number of managers, disproportionately terminating diverse managers and retaining managers who were white males. The Firm terminated Plaintiff in a reduction in force in mid-2009 without any assets under management or job prospects.

5. In the fall of 2013, faced with its failure to hire and retain diverse FAs as required under federal consent decrees and faced with the additional threat of litigation from female and

[1] As used herein, the term Financial Advisors includes Financial Advisor Associates and "producing" managers, *i.e.*, those given manager titles or responsibilities but who also maintain a retail brokerage book of business.

minority managers who were disproportionately eliminated in the 2009 merger, the Firm recruited Plaintiff back to be the only African American of 12 Regional Training Officers ("RTOs") across the firm. He joined Morgan Stanley (the merged entity) in 2013 as an Assistant Vice President in its Wealth Management Division. Plaintiff learned that non-African Americans hired into the same position were assigned the Vice President title. When Plaintiff brought the title discrepancy to the Defendant's attention, Plaintiff's business cards were ordered with the title of Vice President. After Plaintiff endured a campaign of harassment, discrimination and retaliation, he was terminated in August 2016.

## **FACTUAL BACKGROUND**

6. Smith Barney and Morgan Stanley both had a long history of discrimination against its brokerage workforces. In the 1970s, the Equal Employment Opportunity Commission ("EEOC") sued Morgan Stanley's predecessor, Dean Witter, for engaging in a class-wide pattern and practice of race and sex discrimination with respect to recruitment, hiring, assignment, training, promotion, and other terms and conditions of broker employment. *See EEOC v. Dean Witter & Co, Inc.*, Case No. 78-839 (E.D. Pa.).[2]

7. After decades without progress, in June 2006, a group of 14 current and former African American Morgan Stanley FAs again notified Morgan Stanley of a pattern and practice

---

[2] In 2001, the EEOC again sued Morgan Stanley on behalf of a class of female officers and women eligible for promotion. Morgan Stanley resolved the case in July 2004 by agreeing to a consent decree that required the Firm to pay $54 million. *EEOC/Schieffelin v. Morgan Stanley & Co.*, 01-CIV-8421 (S.D.N.Y.). Individuals too have sought recourse for Morgan Stanley's pattern and practice of race discrimination. *See, e.g.*, *McDowell v. Morgan Stanley*, No. 08-civ-2966 (N.D. Ill.).

of racial discrimination at the Firm.[3] Morgan Stanley pretended to negotiate in good faith with this group of committed employees for meaningful policy reforms. In reality, however, the Firm secretly negotiated to transform a dormant putative gender discrimination class action into a race, color, and national origin class action settlement, *Jaffe v. Morgan Stanley & Co.*, No. 3:06-cv-03903-TEH (N.D. Cal.). The only class representative at the time rejected the settlement and was replaced by another African American former employee who received $125,000 to resolve her time-barred individual claims and support the class action settlement. Latinos were added to the *Jaffe* settlement as an afterthought and without the presence or participation of a Latino class representative. In October 2007, Morgan Stanley announced it would settle the transformed *Jaffe* case for $16 million, to be distributed among a class of African American and Latino employees. Over substantial opposition and after numerous hearings, the court ultimately approved the settlement, acknowledging that the monetary relief was "low" but relying on the programmatic relief that the parties represented would improve opportunities for African American (and Latino) FAs.[4]

8. The reforms obtained in the class action settlements have utterly failed, and Morgan Stanley's discriminatory policies and practices continue in full force. Indeed, Morgan Stanley has not complied with the consent decrees and programmatic relief to which it agreed in two nationwide class action settlements, the race and color *Jaffe* settlement or the sex

---

[3] Around the same time, female Morgan Stanley FAs challenged unequal pay and account distributions in the class action sex discrimination lawsuit *Augst-Johnson v. Morgan Stanley & Co.*, No. 06-cv-1142 (D.D.C.). In April 2007, Morgan Stanley agreed to settle that litigation for $46 million.

[4] That the *Jaffe* settlement undervalued the claims was plain after the settlement, when a nearly identical class action lawsuit against Morgan Stanley's competitor Merrill Lynch was settled for $160 million, ten times the $16 million *Jaffe* settlement, for the same number of class members. *See McReynolds v. Merrill Lynch*, Case No. 05-cv-6583, Dkt. 585-1, VIII.A.; 616 (N.D. Ill.).

discrimination *Augst-Johnson* settlement. *Jaffe*, No. 3:06-cv-03903, Dkt. 300; *Augst-Johnson*, No. 06-cv-1142, Dkt. 77. *See also Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 415-16 (7th Cir. 1988) (dismal performance on affirmative action plan could create inference of intentional discrimination).

9. Morgan Stanley has no genuine intent to reform, to provide equal opportunities to African Americans, or to abide by the spirit of its agreement in *Jaffe*. To the contrary, instead of eliminating the racial discrimination, Morgan Stanley agreed to extend the consent decree in an effort to preclude further legal actions. *Jaffe*, No. 3:06-cv-03903, Dkt. 301 (extending the agreement from October 1, 2015, to September 30, 2017, and ending the Diversity Monitor's review and oversight of individual complaints of discrimination).

10. Equally troubling, instead of eliminating the discrimination and need for its female and African American workforce to repeatedly seek relief from the federal courts, Morgan Stanley embarked on a clandestine plan to deny its employees court access for civil rights violations and to deny its employees any ability to join together in any forum to challenge firm-wide discrimination or achieve injunctive relief. *See Frazier v. Morgan Stanley,* No. 1:16-cv-00804 (S.D.N.Y.) (challenging Morgan Stanley's stealth, opt-out arbitration clause and class action waiver practice as a prerequisite to putative class action asserting systematic racial discrimination against African American FAs). These actions were a calculated attempt by Morgan Stanley to continue its rampant discrimination in private and without challenge or accountability in the courts or notice by the investing public.

## DISCRIMINATORY EMPLOYMENT PRACTICES

11. Morgan Stanley maintains strict, centralized control over its wealth management business from its company headquarters, where its senior executives issue mandatory company

policies that apply to all members of the Morgan Stanley workforce. These include uniform, Firm-wide policies and practices that govern management selection, assignment, compensation, promotion, and discipline at Morgan Stanley.

12. As a result of these Firm-wide policies and practices, African Americans are intentionally underrepresented in management positions at Morgan Stanley, and the few African American managers are often purposefully regulated to less lucrative branches and positions.

13. The underrepresentation of African Americans in management positions is consistent with industry-wide trends. According to the United States Government Accountability Office's November 2017 report, *Financial Services Industry: Trends in Management Representation of Minorities and Women and Diversity Practices, 2007-2015* ("GAO Report"), "the proportion of African-Americans in management positions decreased from 6.5 percent to 6.3 percent" for the financial services sector overall. For securities firms like Morgan Stanley, the percentage of managers who are African American decreased from 4.5% to 3.7% between 2007 and 2015. African Americans held only 3.1% of senior-level management positions at financial services firms in 2007, and by 2015 that percentage had dropped to just 2.7%. The GAO Report notes that these declines in African American representation among management ranks occurred during a period when diversity in the pool of qualified applicants increased significantly. For example, among graduates attaining MBA degrees, the percentage of minorities increased from 35.6% to 39.2% between 2011 and 2015. The GAO Report also noted several challenges to retaining and promoting minorities in the financial services industry, including minority underrepresentation in existing management and leadership ranks, unconscious bias, and "employee resistance, particularly from middle-managers."

14. In addition, African American managers receive fewer resources and administrative and managerial support. Worse, African American managers are often undermined in their positions by their supervisors and other managers, who fail to support their decisions or weaken their authority with FAs in the branch or otherwise. Even when problems in the branch pre-date the African American managers or resulted from external factors, African American managers are blamed for the problems but not credited when they were able to resolve them successfully.

15. Morgan Stanley maintains stereotypical views about the skills, abilities and potential of African Americans that form the basis of the policies and practices that result in the differential treatment of African American managers.

16. When Morgan Stanley merged with Smith Barney, the Firm conducted discriminatory talent reviews that frequently selected less qualified and less experienced white, male candidates for lucrative positions over more talented and better diverse managers, for a host of pretextual and inconsistent reasons.

17. During a nationwide meeting for diverse managers, Charles D. Johnston, the Firm's President at the time, announced the Firm's Top 10 Initiatives, and then as an afterthought labeled "Diversity" number 11. He also frankly admitted the Firm's failings in its treatment of minorities in the FA ranks and even more so in management and senior management, saying "shame on us we need to get that fixed." While Johnston conceded the lack of diverse branch and senior managers, he relied on stereotypes in part to excuse the underrepresentation. Johnston claimed that Morgan Stanley could not sacrifice quality, suggesting that minorities are less qualified. He suggested that the FA population should be between 20-25% diverse, including women, and should mirror the demographics of local, high-net-worth clients. Andy Saperstein,

the Managing Director and Head of Wealth Management for Morgan Stanley, lamented it was "too depressing" to "have to fire white males" to increase minority representation at the Firm.

18. In sum, Morgan Stanley has and is engaged in an ongoing nationwide pattern and practice of race discrimination and knowingly employs company-wide policies and practices that have an intentional disparate impact on African Americans. The Firm's systemic discrimination against African Americans includes, but is not limited to, the following practices:

a. denying African American managers essential managerial, administrative, operations, compliance, and recruiting support, including staff and other resources;

b. marginalizing and undermining the authority of African American managers in a number of ways, including by permitting or encouraging others to bypass the African American managers and by soliciting criticism about African American managers;

c. exercising discretion in favor of white managers and to the detriment of African American managers;

d. denying African American managers the same level of support, grooming, training, resources and opportunities for career advancement provided to non-African Americans;

e. employing management training, assessment, selection and assignment practices that intentionally discriminate against African Americans;

f. systematically paying African Americans lower wages and/or denying African Americans opportunities to increase their earnings, including career opportunities and bonuses;

g. making significant employment decisions based on race or racial stereotypes;

h. taking adverse actions against African Americans, such as reduction in job responsibilities, demotions, transfers, constructive discharges and discharges on account of their race and/or their rejection of or unwillingness to tolerate racial harassment;

i. negligently hiring and/or retaining employees with known propensities to discriminate based on race and to retaliate against those who complain;

j. retaliating against African Americans who complain of discrimination, including subjecting them to further discrimination, harassment, retaliation, and terminating them; and

k. refusing to take adverse actions against co-workers and managers who engage in discrimination.

19. The intentional discrimination described above is ongoing and constitutes a continuing violation of the civil rights laws.

**Plaintiff Has Been Subjected To And Harmed By Morgan Stanley's Unlawful Conduct**

20. Like other African American managers, Plaintiff was subjected to Morgan Stanley's intentional race discrimination and retaliation. Plaintiff has suffered substantial harm.

21. Plaintiff was well-qualified to succeed at Morgan Stanley. Plaintiff earned a BA in Economic History and Theory from Hampshire College and had substantial financial services experience, having worked at Merrill Lynch and Smith Barney. Indeed, Plaintiff was a successful FA at Merrill Lynch when Smith Barney recruited him to join the Firm in 2001.

22. Plaintiff first joined the Firm's management as a Regional Planning Specialist with Smith Barney in early 2007, after which the Firm forced Plaintiff to transfer his book of

business. Consistent with the Firm's policy or practice of discriminatory talent interviews during the merger, the Firm terminated Plaintiff in mid-2009 without any assets under management or job prospects.

23. In the fall of 2013, faced with its failure to hire and retain diverse FAs as required under the *Jaffe* consent decree, the Firm recruited Plaintiff back to be the only African American of 12 Regional Training Officers ("RTOs") across the firm.

24. The RTOs are responsible for developing Financial Advisor Associates ("FAAs") and driving their overall successful performance. RTOs determine how best to execute the role in their respective regions, but much of their success depends on their ability to work with complex and branch managers to train their FAAs and identify areas of concern. The key objective measure of an RTO's performance is FAA Effectiveness, which was determined based on a set formula that factored in the success and longevity of trainees in the FAA program.

25. Plaintiff was charged with the Mid-Atlantic region, which included six complexes and 40 branch offices spread throughout southern New Jersey, the metropolitan Philadelphia area, Delaware, Maryland, the District of Columbia, and Virginia. Drew Hawkins, an African American male, served as Plaintiff's Regional Director.

26. As a result of intentional racial discrimination at Morgan Stanley, African Americans remained underrepresented even under Hawkins. Across the entire region, there was one African-American Complex Director and there were only two non-producing African American managers below the Complex Manager level, both of whom were hired into their positions more recently. There was also a single African American Financial Advisor who began serving as a producing manager in a small office during the latter part of Plaintiff's RTO tenure.

27. Plaintiff was determined to succeed in his new role. During the fall 2013 and early 2014, Plaintiff traveled the region, meeting with field managers and analyzing the region's FAA training program. Plaintiff met with Regional Business Development Manager Mike Stadnik and Head of FAA Training Scott Drever to improve the FAA training program based on that analysis. Plaintiff participated in regional managers' and leadership meetings and was a regular speaker on Regional Director Drew Hawkins' weekly regional management calls. In recognition of Plaintiff's success, Plaintiff received a raise and a significant bonus.

28. Plaintiff experienced some discriminatory pushback, however, from two white Complex Managers who refused to work with him on improving FAA effectiveness: Richard Frick from Philadelphia and Scott Boylan from Baltimore. But Hawkins' leadership tempered the discrimination. Boylan, who had a history of discrimination and harassment at the Firm, discouraged his managers and African American Associate Complex Manager ("ACM")—whom Plaintiff knew Boylan called "boy" [5]—from working with him. Plaintiff relied on managerial cooperation to improve FAA outcomes, yet due to Boylan's racial animus he was effectively barred from the complex. Plaintiff complained about Boylan's discriminatory behavior to Stadnik, who, while working under Hawkins, brokered a tentative peace between Plaintiff and Boylan.

29. In the spring of 2014 Lisa Cregan (white female) replaced Hawkins as Regional Director, and Seth Goldzweig (white male) became Plaintiff's immediate supervisor.

---

[5] *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (noting that use of "boy" may be probative of racial bias depending on context and tone among other things); Amicus Curiae Br. in Supp. of Pl.-Appellant's Pet. For Reh'rg En Banc of Civil Rights Leaders, *Hithon v. Tyson Foods, Inc.*, No. 08-16135-BB (11th Cir. Oct. 16, 2010) (explaining that "the term 'boy' to describe an African-American man is deeply offensive and that its use reflects discriminatory intent" given its "historical and social context").

30. Cregan made her racial bias clear from the beginning, insisting on calling Plaintiff "Johnny," a nickname she created for Plaintiff with the intent of diminishing his status in the workplace. Plaintiff had not given Cregan permission to call him "Johnny." Cregan's racial animus was evident in the context of a white superior talking to her black inferior. As Cregan intended, Plaintiff felt powerless to stand up to his superior.

31. Cregan refused to provide Plaintiff with the support she provided her non-African American subordinates. She initially refused to meet with Plaintiff at all and later only met with him with Stadnik, a white male, present. Cregan was critical of Plaintiff's performance without a clear understanding of the RTO role and passed on generalized grievances from Boylan and Frick. Cregan began skipping their weekly meetings, but Stadnik continued to bully Plaintiff.

32. Worse yet, Cregan, Stadnik and Goldzweig began a campaign of malicious acts designed to destroy Plaintiff's name, reputation and career. For example, Goldzweig issued Plaintiff a false mid-year review, asserting that Plaintiff had poor relationships with his field managers. Yet, when Plaintiff repeatedly pressed Goldzweig for examples, he refused to provide any. Plaintiff complained of the racial discrimination in Goldzweig's evaluation to Drever who referred the matter to Human Resources ("HR"). Although an HR professional contacted Plaintiff, he was never apprised of the outcome of any investigation. On information and belief, no meaningful investigation was conducted.

33. Instead of addressing Plaintiff's complaint, Drever relied on Goldzweig's discriminatory mid-year review in assessing Plaintiff's 2014 year-end performance, marking Plaintiff down in his 2014 Year-End Review. As a result of that discrimination and/or in retaliation for his complaint to HR, the Firm denied Plaintiff a raise and significant bonus in January 2015.

34. Cregan also emboldened Boylan's racist animus against Plaintiff. Instead of enlisting Plaintiff's expertise in FAA training and coaching, Boylan asserted that African Americans were inherently less capable of passing the Series 7 examination. Boylan neglected to consider his own role in failing to mentor and train African Americans for the exam, as he did for whites. Boylan insisted instead that Plaintiff locate a specialized Series 7 exam preparation curriculum geared to remedying the intellectual weakness he perceived in Plaintiff's race. Plaintiff reported Boylan's racist comments and animosity to HR.

35. Yet again, instead of properly addressing Plaintiff's concerns, the Firm responded by attempting to sully Plaintiff's professional reputation. In October 2015, well after the mid-point of the year, Stadnik and Drever issued Plaintiff another unsupported, negative Mid-Year Review. Plaintiff complained to HR of racial and/or age discrimination and retaliation in connection with *that* review. HR promised Plaintiff that Drever would provide specific examples to back up the unsubstantiated assertions in the Mid-Year Review, but Drever never provided any such examples.

36. As part of Plaintiff's communications with HR regarding the 2015 Mid-Year Review, Plaintiff analyzed FAA Effectiveness during his tenure as an RTO. The analysis proved that he had improved FAA Effectiveness dramatically in his region, moving the Mid-Atlantic from last place to first place in the regional rankings. Plaintiff also provided his analysis to Drever.

37. Despite his knowledge of Plaintiff's objective success, Drever again denied Plaintiff a raise and a significant bonus in January 2016, relying on vague complaints that field managers wanted "more" from Plaintiff or that Plaintiff was too "verbose."

38. On August 4, 2016, without ever raising any concrete performance concerns, Drever terminated Plaintiff. Plaintiff implored Drever not to further devastate his family, but Drever could not be swayed.

39. Plaintiff requested that HR investigate his termination as retaliation for his previous complaints of discrimination. When HR representative Jessica Krentzman contacted Plaintiff to address his concerns, she referenced a "360°" review from 2015 containing feedback from mostly ACMs and branch managers. Plaintiff had never participated in a similar review for any other employee during his time at the Firm, nor had he heard of anyone else receiving one. The reviewers indicated that Plaintiff frequently met their expectations. Still, Krentzman concluded there was no basis to find his termination unlawful.

40. The Firm reported Plaintiff's termination to the Financial Industry Regulatory Authority ("FINRA") as a discharge due to "Management concerns regarding employee's performance," damaging Plaintiff's reputation in the financial industry. This false statement has prevented Plaintiff from obtaining employment with another financial firm.

41. Plaintiff was paid less than his non-African American counterparts. Plaintiff lost substantial earnings due to Morgan Stanley's conduct and his career has been irreparably damaged. Plaintiff lost wages and other benefits, suffered emotional distress and other nonpecuniary losses, and his career was irreparably injured as a result of Morgan Stanley's conduct. Morgan Stanley's actions have caused and continue to cause Plaintiff substantial losses in earnings and other employment benefits, in an amount to be determined by a jury.

**COUNT I**

**RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

42. Plaintiff realleges paragraphs 1 through 41 and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

43. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

44. Plaintiff is a racial minority as an African American.

45. Plaintiff accepted Morgan Stanley's employment offer on or about August 20, 2013, and continued to work pursuant to their employment agreement until Morgan Stanley terminated him in violation of his federally protected rights in August 2016.

46. Plaintiff was subjected to and harmed by Morgan Stanley's systemic and individual discrimination.

47. Morgan Stanley maintains a pattern or practice of systemic race discrimination against African Americans that constitutes intentional race discrimination.

48. Morgan Stanley intentionally discriminated against Plaintiff by, among other things, paying him less than his non-African American counterparts, providing him less managerial support than his non-African American counterparts, forcing him to work with a known discriminator, more harshly evaluating his performance, failing to investigate his complaints, and finally terminating him despite his objective success as an RTO.

49. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages, including but not limited to reputational damages, lost income, and emotional distress.

**COUNT II**

**RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**

50. Plaintiff realleges paragraphs 1 through 49 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

51. Section 1981 prohibits retaliation for opposing practices that one reasonably believes to cause intentional discrimination.

52. Plaintiff engaged in protected activity when he complained of intentional discrimination to his supervisors and HR regarding, among other things, the Complex Managers' refusal to work with him due to his race, discriminatory assignments, discriminatory statements about African American men, discriminatory performance reviews, and his termination.

53. In retaliation for Plaintiff's protected conduct, Defendant denied Plaintiff managerial support, customary raises, and significant bonuses, issued false performance reviews, terminated Plaintiff's employment, and marred his FINRA report with false charges of poor performance.

54. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages, including but not limited to reputational damages, lost income, and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find against Defendant as follows:

a. Declare that Morgan Stanley's acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981;

b. Declare that Morgan Stanley engages in a pattern and practice of racial discrimination against African American managers and intentionally employs policies and practices that discriminate against African American managers;

c. Enjoin Morgan Stanley from engaging in racial discrimination;

d. Award Plaintiff the value of all compensation and benefits lost and that he will lose in the future as a result of Morgan Stanley's unlawful conduct;

e. Reinstate Plaintiff to his position with retroactive seniority and full back pay and benefits, and otherwise make Plaintiff whole;

f. Expunge and amend Plaintiff's Uniform Termination Notice for Securities Industry Registration ("Form U5") Reason for Termination and Termination Explanation pursuant to this Court's equitable powers to grant remedial relief, 42 U.S.C. § 1981a;

g. Award Plaintiff compensatory and punitive damages;

h. Award Plaintiff prejudgment interest, attorneys' fees, and costs, as provided by law;

i. Award Plaintiff such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff; and

j. Award Plaintiff such other relief as this Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiff,

By: /s/ *Shona B. Glink*

Shona B. Glink (# 4051280)
Linda D. Friedman (pro hac vice pending)
**STOWELL & FRIEDMAN LTD.**
303 W. Madison, Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888