**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN LOCKETTE,

                Plaintiff,

      v.

MORGAN STANLEY & CO., LLC,
MORGAN STANLEY SMITH BARNEY
LLC, AND MORGAN STANLEY,

             Defendants.

Case Action No. 18-cv-00876-JGK

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO COMPEL ARBITRATION AND STAY THIS ACTION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION.................................................................................................1

II.     FACTUAL BACKGROUND. ...........................................................................2

        A.      Plaintiff's Employment with Morgan Stanley...........................................2

        B.      Morgan Stanley's CARE Arbitration Program. ........................................3

        C.      Plaintiff Entered Into A Binding Arbitration Agreement Covering His
                Claims.......................................................................................................5

III.    ARGUMENT. ...................................................................................................8

        A.      The Federal Arbitration Act and Supreme Court Authority Require the
                Court to Enforce Plaintiff's Arbitration Agreement..................................8

        B.      The Court Should Compel Arbitration of Plaintiff's Claims and Stay Court
                Litigation of Those Claims.....................................................................10

                1.      Plaintiff Entered Into a Valid Arbitration Agreement by
                        Continuing His Employment Without Opting Out.   ..........................14

                2.      Plaintiff's Claims Are Covered by the CARE Arbitration
                        Agreement and Are Arbitrable. ............................................21

IV.     CONCLUSION. .............................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Raymours Furniture Co., Inc.*,
  No. 13-5387, 2014 WL 3952944 (E.D. Pa. Aug. 13, 2014)........................................15, 17, 20

*Arciniaga v. Gen. Motors Corp.*,
  460 F.3d 231 (2d Cir. 2006) (Section 1981 claims arbitrable)...............................................21

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (2011) .................................................................................................1, 9, 15

*Blair v. Scott Specialty Gases*,
  283 F.3d 595 (3d Cir. 2002) ....................................................................................................20

*Boule v. Credit One Bank*,
  No. 15-cv-8562, 2016 WL 3015251 (S.D.N.Y. May 11, 2016)................................................17

*Buchman v. Weiss*,
  No. 08-cv-5453, 2009 WL 2044615 (S.D.N.Y. July 15, 20019) ............................................15

*C. Edgar Wood, Inc. v. Clark*,
  1986 Del. Ch. LEXIS 517 (Del. Ch. Jan. 21, 1986) .................................................................20

*Clearfield v. HCL Am. Inc.*,
  No. 17-cv-1933, 2017 WL 2600116 (S.D.N.Y. June 15, 2017).........................................16, 17

*Couch v. AT&T Servs., Inc.*,
  No. 13-2004, 2014 WL 7424093 (E.D.N.Y. Dec. 31, 2014)..............................................15, 18

*Csukardi v. Platinum Corral, LLC*,
  No. 16-cv-00064, 2017 U.S. Dist. LEXIS 21772 (W.D. Va. Feb. 16, 2017)..........................21

*Descafano v. BJ's Wholesale Club, Inc.*,
  No. 15-cv-7883, 2016 WL 1718677 (D.N.J. Apr. 28, 2016) ............................................17, 20

*DuBois v. Macy's East Inc.*,
  338 F. App'x 32 (2d Cir. 2009).........................................................................................14, 16

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ................................................................................................................10

*Gedid v. Huntington Nat'l Bank*,
  No. 11-cv-1000, 2012 WL 691637 (W.D. Pa. Feb. 10 2012) .................................................18

*Grant v. Morgan Stanley Smith Barney LLC*,
  No. 16-cv-81924, 2017 WL 1044484 (S.D. Fla. Mar. 20, 2017) ...........................................20

*Guyden v. Aetna, Inc.*,
  544 F.3d 376 (2d Cir. 2008) ....................................................................................................9

*Hicks v. Macy's Dept. Stores, Inc.*,
  No. 06-cv-02345, 2006 WL 2595941 (N.D. Cal. Sept. 11, 2006)..........................................19

*Isaacs v. OCE Bus. Servs., Inc.*,
  968 F. Supp. 2d 564 (S.D.N.Y 2013) (JGK) ....................................................................14, 17

*Jayasundera v. Macy's Logistics & Operations*,
  No. 14-cv-7455, 2015 WL 4623508 (D.N.J. Aug. 3, 2015)...................................................20

*Katz v. Cellco Partnership*,
  794 F.3d 341 (2d Cir. 2015) ..................................................................................................21

*Kindred Nursing Centers Ltd. P'Ship. v. Clark*,
  137 S. Ct. 1421 (2017) .......................................................................................................9, 15

*Kopple v. Stonebrook Fund Mgmt., LLC*,
  18 A.D.3d 329 (1st Dep't 2005)..............................................................................................20

*Lewis Trees Serv., Inc. v. Lucent Techs. Inc.*,
  239 F. Supp. 2d 332 (S.D.N.Y. 2002) (JGK) ........................................................................10

*Manigault v. Macy's East, LLC*,
  318 F. App'x 6 (2d Cir. 2009) .....................................................................................14, 16, 18

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995) ...................................................................................................................9

*McNeil v. Haley S., Inc.*,
  No. 10-192, 2010 U.S. Dist. LEXIS 95658 (E.D. Va. Sept. 13, 2010) ..................................20

*Meckel v. Cont'l Res. Co.*,
  758 F.3d 811 (2d Cir. 1985) ...................................................................................................18

*Mehler v. Terminix Int'l Co.*,
  205 F.3d 44 (2d Cir. 2000) .....................................................................................................10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) .................................................................................................................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ...................................................................................................................10

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) ................................................ 18

*Oldroyd v. Elmira Sav. Bank, FSB*,
   134 F.3d 72 (2d Cir. 1998) ................................................. 10

*Perry v. Thomas*,
   482 U.S. 483 (1987) ........................................................... 9

*Progressive Cas. Ins. Co. v. C. A. Reaseguradora Nacional de Venezuela*,
   991 F.2d 42 (2d Cir. 1993) ................................................ 15

*Raniere v. Citigroup, Inc.*,
   827 F. Supp. 2d 294 (S.D.N.Y. 2011) ................................ 17

*Ranny v. Bauza*,
   No. 10 Civ 7519, 2011 WL 4056896 (S.D.N.Y Aug. 3, 2011) ............................ 14

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) .............................................. 18

*Seguin v. Northrop Grumman Sys. Corp.*,
   277 Va. 244 (Va. 2009) ..................................................... 18

*Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.*,
   No. 08-cv-986 (JGK), 2009 WL 1788054 (S.D.N.Y. June 23, 2009) ................... 15

*Specht v. Netscape Commc'ns Corp.*,
   150 F. Supp. 2d 585 (S.D.N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002) ................ 10, 14, 18

*Stern v. Espeed, Inc.*,
   No. 06-cv-958, 2006 WL 2741635 (S.D.N.Y. Sept. 22, 2006) ............................ 20

*Thomas v. Morgan Stanley Smith Barney LLC, et al.*,
   Dkt. BC680860 (Cal. Sup. Ct. Mar, 1, 2018) ...................... 20

*U.S. v. Tejeda*,
   824 F. Supp. 2d 473 (S.D.N.Y. 2010) ................................ 14

*Uddin v. Sears, Roebuck & Co.*,
   No. 13-cv-6504, 2014 WL 1310292 (D.N.J. Mar. 31, 2014) ......................... 18

*USWA v. Warrior & Gulf Navigation Co.*,
   363 U.S. 574 (1960) ...................................................... 1, 9

*Wilson v. Darden Restaurants, Inc.*,
   No. 99-cv-5020, 2000 WL 150872 (E.D. Pa. Feb. 11, 2000) ........................ 17

*Zengotitia v. Morgan Stanley & Co., LLC*,
    No. 17-cv-897, Dkt. 25 (S.D.N.Y. Apr. 13, 2017) ................................................................20

**Statutes**

9 U.S.C. § 2 ...........................................................................................................................8

42 U.S.C. § 1981 ...............................................................................................................1, 21

Federal Arbitration Act...............................................................................................*passim*

Defendants Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC ("MSSB"), and Morgan Stanley (collectively, "Defendants" or "Morgan Stanley") submit this Memorandum of Law in support of their Motion to Compel Arbitration of the claims raised in the Complaint filed by Plaintiff John Lockette ("Plaintiff").

## I.    INTRODUCTION.

Plaintiff, a former Regional Training Officer for MSSB, seeks to assert racial discrimination and retaliation claims in this Court against Defendants pursuant to 42 U.S.C. § 1981 ("§ 1981"). However, Plaintiff entered into a valid and binding arbitration agreement in which he agreed to arbitrate "any and all claims … based on, arising out of, or which arose out of [his] employment … includ[ing] statutory discrimination, harassment and retaliation claims, and claims under [or] based on … any federal … statute."

Plaintiff is bound by this agreement. As the Supreme Court has repeatedly explained, the Federal Arbitration Act ("FAA") reflects "a liberal federal policy favoring arbitration" and requires courts to enforce arbitration agreements according to their terms. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011). The federal "presumption of arbitrability" requires that arbitration be compelled ***unless*** it may be said with "positive assurance" that the parties' agreement "is not susceptible of an interpretation that covers … the dispute." *USWA v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).

Defendants respectfully request that the Court compel Plaintiff's claims to arbitration and stay this action pending the completion of arbitration pursuant to Section 4 of the FAA. 9 U.S.C. § 4.

-1-

II.     **FACTUAL BACKGROUND.**

A.     **Plaintiff's Employment with Morgan Stanley.**

Plaintiff was hired by MSSB in August 2013 as an Assistant Vice President in the Wealth

Management Division and was assigned to serve as the Regional Training Officer ("RTO") for

the Mid-Atlantic region.  *See* Complaint ("Compl.") ¶¶ 5, 23, 25; Declaration of Scott Drever

("Drever Decl.") ¶¶ 3-7.  Plaintiff was hired for this position by Scott Drever, who was

Executive Director overseeing Financial Advisor Development and Talent Acquisition for MSSB

throughout Plaintiff's employment.  Drever Decl. ¶¶ 1, 4-6.[1]

As the RTO for the Mid-Atlantic region, Plaintiff reported directly to Drever, who

supervised Plaintiff from his office in Purchase, New York.  *Id.* ¶¶ 1, 3, 7-8.[2]  As Plaintiff's

supervisor, Drever was responsible for decisions concerning Plaintiff's employment, including

decisions that are the subject of Plaintiff's Complaint.  *Id.* ¶ 10.  Drever frequently spoke with

Plaintiff and had regularly scheduled calls with Plaintiff.  *Id.* ¶¶ 11, 20-21.  Drever also had

regularly scheduled weekly calls with all of the RTOs, including Plaintiff, to discuss industry and

regulatory developments and important developments in MSSB's policies and practices.  *Id.* ¶

21.

---

[1] Drever's responsibilities included overseeing the training and development for all Financial Advisor Associates,
Private Banker Advisory Associates, Wealth Advisory Associates, Resident Financial Advisors, Leadership
Mentoring Advisory Associates and Private Wealth Advisor Associates (collectively, "Trainees"), as well as
supervising all RTOs, including Plaintiff.  *Id.* ¶ 3.

[2] Plaintiff reported directly to Drever in New York from the time of Plaintiff's hire until June 15, 2014, and then
again from November 1, 2014 until his termination.  *Id.* ¶ 8.  For a brief period from June 16, 2014 until October 31,
2014, Plaintiff reported directly to Seth Goldzweig, who reported to Drever, and whose office was also located in
Purchase, New York.  *Id.* ¶ 9.

Plaintiff's office was located in the Regional Office for the Mid-Atlantic region in Philadelphia, Pennsylvania, and he was responsible for training and developing Trainees in the Mid-Atlantic region.  *See* Drever Decl. ¶¶ 12, 15; Compl. ¶¶ 23-25.  Due to the nature of his responsibilities and the geographic dispersion of the Trainees he worked with,[3] Plaintiff traveled throughout the Mid-Atlantic region meeting with Trainees and/or local management in their branch offices.  Drever Decl. ¶ 14.

**B.      Morgan Stanley's CARE Arbitration Program.**

More than ten years ago, Morgan Stanley launched an internal employee dispute resolution program, entitled CARE (Convenient Access to Resolutions for Employees), which includes the CARE Arbitration Program.  Declaration of Jessica Krentzman ("Krentzman Decl."), ¶ 3.  From November 20, 2009 until it was revised in 2015, the CARE Arbitration Program was set forth in the pre-2015 version of the CARE Guidebook.  *Id.* ¶ 3 & Ex. 1.  This version of the CARE Guidebook, like other Morgan Stanley Human Resources ("HR") policies, was posted on me@MS, the Firm's intranet site where Morgan Stanley HR policies, including those governing CARE, are maintained and readily available to and accessible by all Firm employees in the U.S., and which employees utilize to access HR related information and other information regarding and governing their employment, including information on benefits, compensation, payroll, HR policies (including but not limited to those governing CARE), and diversity.  *Id.*

---

[3] The geographic composition of the Mid-Atlantic region vacillated somewhat over time.  In May 2015, the Mid-Atlantic region encompassed approximately 75 branch offices located in six states (Pennsylvania, Delaware, Maryland, New Jersey, New York, and Virginia) and the District of Columbia.  Drever Decl. ¶ 13.

The pre-2015 version of the CARE Guidebook describes the CARE Arbitration Program in effect during that period, which included both a mandatory arbitration program for some claims, and a voluntary arbitration program for other claims. *Id.* For example, the pre-2015 version of the CARE Guidebook states, in relevant part:

> If you are a current or former employee who was registered at any time during your employment with Morgan Stanley and you wish to pursue a statutory employment discrimination claim …, you may, (1) proceed to arbitration, through (a) the arbitration forums administered by JAMS or AAA, if Morgan Stanley agrees, or (b) a self-regulatory organization (SRO), such as FINRA, or (2) go to court. For all other employment claims, registered employees will continue to be required to submit their claims to binding arbitration as required by their Form U-4 Agreement.

*Id.*

Importantly, this pre-2015 version of the CARE Guidebook also states:

> **Changes to CARE**
> Upon notice, the terms of CARE may change or be discontinued. Any material changes made to CARE will be announced in advance of their effective dates and will then become equally binding upon you and the Firm. In the event of such a change, pending claims will be governed by the Program in effect at the time of filing of the Request for Mediation/Arbitration Form(s) with the Program Administrator.

*Id.*

In 2015, Morgan Stanley announced an expansion of the CARE Arbitration Program to make arbitration mandatory for all covered claims. *Id.* ¶ 4. Morgan Stanley delivered an explanatory notice to all employees in the U.S. via each employee's individualized Morgan Stanley email account that announced and explained the expansion of mandatory arbitration under the CARE Arbitration Program and contained links to their CARE Arbitration Agreements, an updated CARE Guidebook describing the expanded CARE Arbitration Program, and a CARE Arbitration Program Opt-Out Form which explained how employees could opt out of the CARE Arbitration Program if they wished to do so. *Id.* ¶¶ 4, 14. These communications

-4-

were sent in waves by Morgan Stanley's HR Department in New York, starting on May 20, 2015. *Id.* ¶ 4.  Also starting on May 20, 2015, information about the expansion of the CARE Arbitration Program and links to the updated CARE Guidebook and the new CARE Arbitration Agreement were posted and maintained on me@MS, the Firm's intranet site, where they were readily available to and accessible by all Morgan Stanley employees, including Plaintiff, on their computers from May 20, 2015 until after the June 19, 2015 deadline for employees to opt out of the CARE Arbitration Program. *Id.*  Throughout that opt-out window, Morgan Stanley also posted on me@MS a reminder notice about the expansion of mandatory arbitration under the CARE Arbitration Program and the deadline for opting out. *Id.* ¶ 15.

Morgan Stanley's use of both email communications and postings on me@MS to communicate information about the expansion of the CARE Arbitration Program was consistent with how it communicates important and time-sensitive information about other HR policies and policy changes. *Id.* ¶ 16.[4]

C.  **Plaintiff Entered Into A Binding Arbitration Agreement Covering His Claims**.

Plaintiff was included in the first wave of communications announcing and explaining the expansion of mandatory arbitration under the CARE Arbitration Program.  The CARE Arbitration Agreement was delivered to and received by Plaintiff via his individual Morgan

---

[4] Morgan Stanley typically communicates important and time-sensitive information about its HR and other policies and changes to those policies by posting the information, policy, or revised policy on me@MS. *Id.*  On occasion, as happened here, Morgan Stanley also communicates such information by email, together with links to the policies or policy changes. *Id.*

Stanley email account on May 20, 2015,[5] together with an explanatory notice, and links to the

CARE Guidebook (which described the new CARE Arbitration Program) and a CARE

Arbitration Program Opt-Out Form.  *Id.* ¶¶ 5-12 & Exs. 2-5.  Information about the new CARE

Arbitration Program and links to the updated CARE Guidebook and the new CARE Arbitration

Agreement were also posted on me@MS, where they were readily available to and accessible by

Plaintiff on his computer from May 20, 2015 until after the June 19, 2015 deadline for Plaintiff

to opt out of the CARE Arbitration Program.  *Id.* ¶¶ 4, 15.

The notice Plaintiff received on May 20, 2015 made clear that, by continuing his

employment after the new CARE Arbitration Agreement's effective date (June 19, 2015) without

opting out, Plaintiff would accept, agree to, and become bound by the new CARE Arbitration

Agreement:

> By continuing your employment with [MS], you accept and agree to, and will
> be…bound by the terms of the Arbitration Agreement…, unless you elect to opt
> out…by completing, signing and submitting an effective CARE Arbitration
> Program Opt-Out Form by June 19, 2015….  If you remain employed and do not
> timely complete, sign and submit an effective…Opt-Out Form,… you have
> consented and agreed to the terms of the Arbitration Agreement….

*Id.* ¶ 7 & Ex. 2.  The notice also explained that "[y]our decision to opt out…will not

adversely affect your employment status with the Firm."  *Id.* ¶ 8 & Ex. 2.

The scope and mandatory nature of arbitration under the new CARE Arbitration

Agreement was readily apparent from this notice received by Plaintiff on May 20, 2015, which

was titled "Expansion of CARE Arbitration Program" and explained that the Firm was

expanding mandatory arbitration under the CARE Arbitration Program:

---

[5] Defendants' records show that this email to Plaintiff did not trigger an automatic reply out of office message, and

that Plaintiff was not on a leave of absence at any time from May 20, 2015 to June 19, 2015.  Krentzman Decl. ¶ 5.

to extend arbitration obligations for all U.S. employees – registered and non-registered.  Effective June 19, 2015, arbitration…will be mandatory for all employees in the U.S., and all covered claims…will be resolved through final and binding arbitration … as more fully described in the Arbitration Agreement and CARE Guidebook.

*Id.* Ex. 2.[6]  Plaintiff was expressly told in this notice that "[i]t is important that you read and understand the Arbitration Agreement and CARE Guidebook as they describe the terms, features and details of this program," which he could do by simply clicking on the links in the notice.  *Id.*

The Opt-Out Form is a simple one-page document which explained that "[i]f you wish to opt out of the Arbitration Agreement…, you must complete, sign and return this form by email by June 19, 2015" and that the completed Opt-Out Form "must be received and acknowledged by return email to be effective."  *Id.* ¶ 12, 14 & Ex. 5.

On May 22, 2015, two days after Plaintiff and the other RTOs received notice of the expansion of CARE Arbitration Program via their individual Morgan Stanley email accounts, Drever discussed the expansion of the CARE Arbitration Program, including the email announcing the expansion of the CARE Arbitration Program, the opt-out option and the opt-out deadline during his regular weekly call with FAA Development team, which included all RTOs, including Plaintiff.[7]  Drever Decl. ¶¶ 24-27 & Ex. 4.

During the opt-out window from May 20, 2015 to June 19, 2015, Morgan Stanley posted and maintained on me@MS a reminder notice about the expansion of mandatory arbitration under the CARE Arbitration Program and the deadline for opting out.  Krentzman Decl. ¶ 15.

---

[6] The scope and mandatory nature of arbitration under the new agreement was also readily apparent from the reminder notice about the expansion of the CARE Arbitration Program posted on me@MS.  *Id.* ¶ 15.

[7] Earlier that day, Plaintiff and Drever had an email exchange in which Plaintiff acknowledged that he would be speaking with Drever later that day at 1 p.m, the time when the weekly FAA Development team call was scheduled for that day.  Drever Decl. ¶ 23 & Ex. 3.

Plaintiff had the choice of continuing his employment with or without binding arbitration. *Id.* ¶ 17.  Indeed, more than 6,600 employees who, like Plaintiff, received notice of the expansion of the CARE Arbitration Program in 2015 submitted a CARE Arbitration Program Opt-Out Form, thereby choosing to continue their employment without binding arbitration.  *Id.* ¶ 20. Unlike those individuals, Plaintiff chose to continue his employment past the opt out deadline and did not submit an Opt-Out Form.[8]  *Id.* ¶ 17; Compl. ¶ 38.  As a result, he became bound by the Arbitration Agreement.  Krentzman Decl.  ¶¶ 17, 19.

Accordingly, Plaintiff entered into a valid and binding Arbitration Agreement in which he agreed to arbitrate "any and all claims or disputes … arising out of …  [his] employment." Krentzman Decl., Ex. 3.  In that Arbitration Agreement, Plaintiff agreed that "any and all … statutory discrimination, harassment and retaliation claims, and claims under … any federal … statute … including … Title VII … and any other … discrimination or employment law…  will be resolved by final and binding arbitration as set forth in this Arbitration Agreement."  *Id.*

## III.    ARGUMENT.

### A.    The Federal Arbitration Act and Supreme Court Authority Require the Court to Enforce Plaintiff's Arbitration Agreement.

The FAA broadly provides that: "A written provision ... to settle by arbitration ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.   In enacting the FAA, Congress intended to overcome courts' past reluctance to enforce arbitration agreements by placing them on equal footing with other contracts and establishing a strong federal policy in favor of arbitration.

---

[8] In addition to never submitting an Opt-Out Form, Plaintiff also never sent an email to carebox@morganstanley.com with any questions or received an email from morganstanley.arbitopt@aonhewitt.com acknowledging that he submitted a CARE Arbitration Program Opt-Out Form.  *Id.* ¶ 18.

*AT&T Mobility*, 131 S. Ct. at 1745 (stating that the FAA reflects a "'liberal federal policy favoring arbitration'"); *Kindred Nursing Centers Ltd. P'Ship. v. Clark*, 137 S. Ct. 1421, 1428 (2017) ("A rule selectively finding arbitration contracts invalid because improperly formed fares no better under the [FAA] than a rule selectively refusing to enforce those agreements once properly made"); *Perry v. Thomas,* 482 U.S. 483, 489 (1987) (observing that the FAA was "a congressional declaration of a liberal federal policy favoring arbitration").

The FAA, and the strong federal policy favoring arbitration that it embodies, require courts to "rigorously enforce agreements to arbitrate." *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Moreover, any ambiguities or doubts as to the scope of an arbitration agreement are to be resolved in favor of arbitration. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *Mitsubishi Motors Corp.,* 473 U.S. at 626 ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration"); *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (the FAA embodies the "liberal federal policy favoring arbitration agreements" and "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). The federal "presumption of arbitrability" requires that arbitration be compelled ***unless*** it may be said with "positive assurance" that the parties' agreement "is not susceptible of an interpretation that covers … the dispute." *USWA*, 363 U.S. at 582-83.

Section 4 of the FAA provides that "[a] party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If a litigant in a court proceeding refuses to arbitrate a

dispute within the scope of a valid arbitration agreement, a judicial order compelling arbitration

is mandatory – not discretionary.  *Id.*

      B.      **The Court Should Compel Arbitration of Plaintiff's Claims and Stay Court Litigation of Those Claims.**

      In determining whether a dispute involving federal statutory claims is arbitrable, a court

must resolve the following three questions:  (1) whether there exists a valid agreement to

arbitrate; (2) whether the particular dispute sought to be arbitrated falls within the scope of the

arbitration agreement; and (3) whether Congress intended the claims to be nonarbitrable.  *See*

*Lewis Trees Serv., Inc. v. Lucent Techs. Inc.*, 239 F. Supp. 2d 332, 335-36 (S.D.N.Y. 2002)

(JGK) (citing *Oldyroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998)).  In

resolving these questions, "courts must 'construe arbitration clauses as broadly as possible,' and

'any doubts concerning the scope of an arbitral issues should be resolved in favor of

arbitration.'"  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983);

*Lewis Trees*, 239 F. Supp. 2d at 336.

      Turning to the first question, federal courts typically apply state-law principles governing

the formation of contracts to determine whether a valid arbitration agreement exists.  *See Mehler*

*v. Terminix Int'l Co.*, 205 F.3d 44, 48 (2d Cir. 2000) (citing *First Options of Chicago, Inc. v.*

*Kaplan*, 514 U.S. 938, 944 (1995)).  In determining which state law to apply, federal courts first

look to the choice-of-law doctrine of the forum state, New York.  *Specht v. Netscape Commc'ns*

*Corp.*, 150 F. Supp. 2d 585, 590-91 & n.7 (S.D.N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002).

Under New York's choice-of-law rules, when determining which state's law to apply to a contract

dispute, "the court evaluates the 'center of gravity' or 'grouping of contacts,' with the purpose of

establishing which state has 'the most significant relationship to the transaction and the parties.'"

*Id*.  (Citations omitted).

-10-

Here, New York law applies and governs the contract formation issue because New York has the greatest interest in, and connection to, this litigation.  The litigation forum is in New York, as Plaintiff elected to file his Complaint and pursue his claims in this Court.  Morgan Stanley and MSSB both maintain their headquarters and principal places of business in New York, "maintain[] a number of branch offices in [New York,]" and "service[] clients who are residents of [New York]."  Compl. ¶ 2.  Further, Drever (Plaintiff's New York-based supervisor)[9] offered Plaintiff his position with MSSB in an offer letter he sent from his office in New York.  Drever Decl. ¶¶ 4-6 & Ex. 1.  This offer letter contains a New York choice of law provision, and Plaintiff accepted this offer by mailing his countersigned letter to Morgan Stanley's HR Department in New York.  *Id*.  Throughout his employment with MSSB, Plaintiff reported directly to Drever in New York, except for a brief period in 2014 when Plaintiff reported directly to Goldzweig, who reported to Drever and, like Drever, was located in New York.  *Id*. ¶¶ 8-9.  Plaintiff also attended and participated in meetings held in New York.  Id. ¶ 19.  Each year, Plaintiff would appear several times as a guest training officer for weeklong training programs in New York and attend and participate in meetings that Drever held for members of the FAA Development team in New York.  Id.

As Plaintiff's direct supervisor, Drever was responsible for decisions concerning Plaintiff's employment, and Drever made those decisions while working in his office in New York.  *Id*. ¶ 10.  Drever also frequently spoke with Plaintiff from his office in New York about his performance.  *Id*. ¶ 11.  In connection with these discussions, Plaintiff sent to Drever in New York documents that Drever then reviewed in his office in New York.  Drever Decl. ¶ 11;

---

[9] Throughout Plaintiff's employment, Drever's office was located in Purchase, New York, and Drever supervised Plaintiff from his office in Purchase New York.  *Id.* 1, 3, 7-8.

Compl. ¶ 36.  Drever also had regularly scheduled weekly calls with Plaintiff from his office in New York.  Drever Decl. ¶¶ 20-21.

Moreover, Plaintiff's allegations in his Complaint primarily relate to purported conduct emanating out of MSSB's headquarters and alleged adverse employment actions attributed to Drever while working in New York.  For example, Plaintiff alleges that (1) "Defendant set forth policies and practices that intentionally discriminated against African Americans from its New York headquarters" (Compl. ¶ 2); and (2) "Morgan Stanley maintains strict, centralized control over its wealth management business from its company headquarters [in New York]."  *Id.* ¶ 11. Plaintiff also alleges that Drever discriminated and retaliated against him by, *inter alia*, initially assigning him the title Assistant Vice-President, issuing Plaintiff allegedly discriminatory and retaliatory performance reviews, allegedly failing to provide specific examples of Plaintiff's performance deficiencies, allegedly denying Plaintiff raises and significant bonuses, and terminating Plaintiff's employment.  *Id.* ¶¶ 5, 33, 35-38, 48, 53.[10]   All of these allegations relate to decisions made and/or actions taken by Drever while working in his office in New York. Drever Decl. ¶¶ 10-11.  For example, Drever both prepared Plaintiff's performance reviews and discussed those reviews with Plaintiff while working in his office in New York.  *Id.*  Drever also made decisions regarding Plaintiff's compensation, including the amount of Plaintiff's base salary and the amount of his annual bonus for each year, while working in his office in New York.  *See Id.* ¶ 10; Compl. ¶¶ 27, 33, 37.  He also made the decisions to offer Plaintiff employment as an Assistant Vice President and to later adjust Plaintiff's title from Assistant Vice President to Vice President while working in his office in New York.  *See* Drever Decl. ¶ 10;

---

[10] Plaintiff also alleges that he was subjected to discrimination by Goldzwieg, who was also located in New York. Compl. ¶ 32; Drever Decl. ¶ 9.

Compl. ¶ 5.  And Drever made the decision to terminate Plaintiff's employment while working in his office in New York.  *See* Drever Decl. ¶ 10; Compl. ¶ 38.

Plaintiff also alleges that he raised several complaints of discrimination or retaliation that were reported to and investigated by Morgan Stanley's HR Department during his employment, and that, after his termination, at his request, HR investigated his allegations that his termination was retaliation for his previous complaints of discrimination.  Compl. ¶¶ 32, 34, 35, 39, 52; Krentzman Decl. ¶¶ 20-21.  Each of these investigations was conducted by members of Morgan Stanley's HR Department based in New York, from their offices in New York.  Compl. ¶¶ 32, 35-36, 39; Krentzman Decl. ¶¶ 20-21.  And the expanded CARE Arbitration Program, including both the new CARE Arbitration Agreement and the updated CARE Guidebook, was designed and implemented in, and disseminated from Morgan Stanley's headquarters in New York, and contained a New York choice of law provision.  Krentzman Decl. ¶ 4 & Ex. 4 at 21.

It is clear then that New York is the "center of gravity" as New York is the state, *inter alia*:  (a) where Plaintiff elected to file his Complaint in this action; (b) where Morgan Stanley is headquartered; (c) from which Plaintiff was offered employment; (d) where Plaintiff's managers were located; (e) where Plaintiff worked for several weeks a year; (f) where Plaintiffs' managers were working when they made the decisions and engaged in the acts that Plaintiff alleges were discriminatory and/or retaliatory; (g) where the Morgan Stanley HR employees who investigated Plaintiff's claims were based and conducted their investigations; (h) where the expanded CARE Arbitration Program, including both the new CARE Arbitration Agreement and the updated CARE Guidebook, was designed, implemented and disseminated to Plaintiff; and (i) designated in choice of law provisions in both Plaintiff's offer letter and the CARE Guidebook.  Accordingly, New York has the strongest interest in the case and New York law governs the

contract formation issues in this case.  *See, e.g.*, *Specht,* 150 F. Supp. 2d at 590-91 (conducting a New York choice of law analysis and applying the law of the state with "the most significant connection to the litigation").[11]

   1.   **Plaintiff Entered Into a Valid Arbitration Agreement by Continuing His Employment Without Opting Out.**

A valid arbitration agreement may be formed by words or by conduct, and an employee will be deemed to have assented to an arbitration agreement by continuing to work after receiving notice of the agreement.  *See DuBois v. Macy's East Inc*., 338 F. App'x 32, 33 (2d Cir. 2009) (summary order); *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 8 (2d Cir. 2009) (summary order);[12] *Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 571 (S.D.N.Y 2013) (JGK) (holding that "employee handbook revisions [including revisions to an arbitration agreement included therein] are binding when an employee continues to work after receiving notice of the revisions").  And "an agreement to arbitrate need only be proven by a

---

[11] As explained below, regardless of which state's law applies, the result would still be the same because Plaintiff received adequate notice of, and accepted and became bound by, his Arbitration Agreement under the laws of the other states.  In the event Plaintiff argues that another state's law should apply rather than New York, that state should be Pennsylvania.  As the RTO for the Mid-Atlantic region, Plaintiff's office was located in the Regional Office for the Mid-Atlantic region, which was located in Philadelphia, Pennsylvania.  Drever Decl. ¶ 15.  Plaintiff's desk, desktop computer, landline telephone, and files were located in Philadelphia.  *Id.* ¶ 16.  Plaintiff's business address was the address of his office in Philadelphia, his signature block on his emails listed his Philadelphia office address, and his office telephone number was a Philadelphia number.  *Id.* ¶¶ 15-18 & Ex. 2.

[12] This Court should consider the controlling authority of the Second Circuit in these decisions though issued in summary orders.  *U.S. v. Tejeda*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010) (although summary orders are non-precedential, they "nonetheless constitute valuable appellate guidance"); *Ranny v. Bauza*, No. 10 Civ. 7519, 2011 WL 4056896, at *3 n. 4 (S.D.N.Y. Aug. 3, 2011) (although summary orders are non-precedential, "this 'does not mean that the court considers itself free to rule differently in similar cases.'").

preponderance of the evidence." *Buchman v. Weiss*, No. 08-cv-5453, 2009 WL 2044615, at *3

& n.5 (S.D.N.Y. July 15, 20019) (citations omitted).  As this Court has recognized:

> While New York law requires the party seeking arbitration to show "an express,
> unequivocal agreement" to arbitrate, a higher standard than for nonarbitration
> agreements, the Court of Appeals for the Second Circuit has held that this rule is
> preempted by the FAA because it discriminates between arbitration agreements and other
> contracts.  Accordingly, the Court of Appeals has held that a party seeking arbitration
> need only prove the existence of a valid arbitration agreement by a preponderance of the
> evidence.

*Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.*, No. 08-cv-986 (JGK), 2009 WL

1788054, at *7 (S.D.N.Y. June 23, 2009) (a law setting a higher standard for the formation of

arbitration agreements than for nonarbitration agreements "is preempted by the FAA because it

discriminates between arbitration agreements and other contracts") (citing *Progressive Cas. Ins.

Co. v. C. A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993); *Couch v.

AT&T Servs., Inc.*, No. 13-2004, 2014 WL 7424093, at *3 (E.D.N.Y. Dec. 31, 2014) (same); *see

also Kindred Nursing Centers*, (ruling that "[a] rule selectively finding arbitration contracts

invalid because improperly formed fares no better under the [FAA] than a rule selectively

refusing to enforce those agreements once properly made" and reversing a Kentucky Supreme

Court decision which had held that, because the Kentucky Constitution protects the rights of

access to the courts and trial by jury, an agent could enter into an arbitration agreement that

"deprive[d] her principal of an 'adjudication by judge or jury' only if the power of attorney

'expressly so provide[d]'" because the Kentucky Supreme Court had "fail[ed] to put arbitration

agreements on an equal plane with other contracts" and "did exactly what *Concepcion* barred:

adopt a legal rule hinging on the primary characteristic of an arbitration agreement – namely, a

waiver of the right to go to court and receive a jury trial"); *Alexander v. Raymours Furniture Co.,

Inc.*, No. 13-5387, 2014 WL 3952944, at *5 (E.D. Pa. Aug. 13, 2014) (noting that "the FAA

-15-

prohibits states from imposing special restrictions on arbitration agreements").

Here, Plaintiff (1) received a copy of the CARE Arbitration Agreement on May 20, 2015, together with a notice explaining that it would become effective on June 19, 2015, and that "[b]y continuing [his] employment with Morgan Stanley, [he] accept[s] and agree[s] to, and will be…bound by the…Arbitration Agreement…unless [he] elect[s] to opt out…by… submitting an effective…Opt-Out Form by June 19, 2015"; (2) had 30 days to consider the Arbitration Agreement and opt out if he so desired; and (3) continued his employment after June 19, 2015 without opting out.  *See* Krentzman Decl. ¶¶ 5-7, 14, 15, 17-19 & Ex. 2.  These facts establish that Plaintiff had adequate notice of, assented to, and became bound by, his Arbitration Agreement by continuing his employment after receipt of the email notice of the expansion of the CARE Arbitration Program and links to the CARE Guidebook and CARE Arbitration Agreement without opting out.  *See DuBois*, 338 F. App'x at 33-34 (plaintiff's continued employment after receiving notice of the arbitration agreement and without opting out "constituted acceptance of  … mandatory arbitration"); *Manigault*, 318 F. App'x at 8 (plaintiff "agreed to arbitration by continuing with her employment" without opting out despite having received notice of the arbitration program and opt-out option because "continued employment, without more, is sufficient to manifest assent"); *Clearfield v. HCL Am. Inc.*, No. 17-cv-1933, 2017 WL 2600116 (S.D.N.Y. June 15, 2017), (holding that plaintiff was bound by an arbitration agreement she received via her company's email account because she did not submit an opt-out form or otherwise notify her employer of her intent to opt out of the arbitration agreement);[13]

---

[13] As MSSB did here, the employer in *Clearfield* sent an email to its employees at their work email addresses notifying them that its arbitration agreement had been modified. *Id.* at *1.  "The e-mail advised employees that HCL had 'modified its … Arbitration Agreement[]' and gave employees the opportunity to opt out of the agreement

*Boule v. Credit One Bank*, No. 15-cv-8562, 2016 WL 3015251, at *3 (S.D.N.Y. May 11, 2016) (proof of receipt is sufficient for arbitration agreement to be binding even if employee did not read it) (citations omitted); *Isaacs*, 968 F. Supp. 2d at 572 ("Upon receipt of the revised [arbitration] procedures [via email] the plaintiff made the choice to continue his employment and is bound to arbitrate his claims under both the original Policy and the Revised Policy"); *Raniere v. Citigroup, Inc.*, 827 F. Supp. 2d 294, 307 (S.D.N.Y. 2011) ("Raniere continued her employment after receipt of [a single] email with the link to the Handbook and…Arbitration Policy.  …  [T]hese facts [are] sufficient to evidence Raniere's assent to the[Arbitration Policy").[14]

---

by returning a form no later than January 5, 2016."  *Id.*  Notably, just as the email Plaintiff received here notified him, the email in *Clearfield* further notified employees that:  "'If you do not submit the opt-out form by the end of the day on January 5, 2016 and if you … continue employment with the Company after such date, you will be deemed to have accepted and agreed to the terms' of the modified [Arbitration] Agreement."  *Id.*  Just as Plaintiff failed to do here, the *Clearfield* plaintiff "did not submit an opt-out form or otherwise notify [defendant] of her intention to opt out of the [Arbitration Agreement] by the January 5, 2016 deadline – or at any point during her employment...."  *Id.*  Significantly, the Court in *Clearfield* found that plaintiff was "plainly bound" by the arbitration agreement even though she was on medical leave when the agreement was sent to her company email account and only returned to work the day prior to the opt-out deadline.  *Id.* at *2.

[14] The result would be the same if Pennsylvania law (where Plaintiff's office was located) or the law of one of the states which Plaintiff visited on occasion applied because Plaintiff received adequate notice of, and accepted and became bound by, his Arbitration Agreement.  *See, e.g.*, *Alexander*, 2014 WL 3952944, at *5 (under Pennsylvania law, "distribution of a mandatory arbitration policy to existing at-will employees … constitutes an offer of continued employment, subject to the terms of the arbitration program, which an employee accepts by continuing his employment after receiving notice of the program"); *Wilson v. Darden Restaurants, Inc.*, No. 99-cv-5020, 2000 WL 150872 at *3-4 (E.D. Pa. Feb. 11, 2000) (under Pennsylvania law, plaintiff accepted arbitration policy by continuing his employment after receiving notice of the policy and beyond its effective date); *Descafano v. BJ's Wholesale*

-17-

Although there can be no genuine dispute as to receipt in this case given the incontrovertible evidence that the CARE notice was delivered to and received by Plaintiff via his Morgan Stanley email account (Krentzman Decl. ¶ 5 & Ex. 2), "New York law has established a presumption that a party has received documents when mailed to the party's address in accordance with regular office procedures." *Manigault*, 318 F. App'x at 6 (citing *Meckel v. Cont'l Res. Co.*, 758 F.3d 811, 817 (2d Cir. 1985); *Couch*, 2014 WL 7424093, at *6-8 (applying presumption of receipt to emails sent to work email addresses in accordance with regular office procedures).[15]  And even if "there is no actual notice of [a] term, an offeree is still bound [if] on inquiry notice of the term." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012) (quoting *Specht*, 306 F.3d at 30 n. 14).  "Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." *Specht* 306 F.3d at 30 n. 14; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) ("to be bound, [recipient] need not actually read the terms…as long as she has notice of their existence").  Morgan Stanley's May 20, 2015 email about the expansion of the CARE Arbitration Program provided inquiry notice by

---

*Club, Inc.*, No. 15-cv-7883, 2016 WL 1718677 (D.N.J. Apr. 28, 2016) (under New Jersey law, plaintiff's receipt of the arbitration agreement and opt-out information, failure to opt-out during the opt-out period, and continued employment constituted assent to the arbitration agreement); *Uddin v. Sears, Roebuck & Co.*, No. 13-cv-6504, 2014 WL 1310292, at *6 (D.N.J. Mar. 31, 2014) (under New Jersey law, plaintiff's receipt of the arbitration agreement and failure to opt out within the opt-out period demonstrated plaintiff's acceptance of the agreement); *Seguin v. Northrop Grumman Sys. Corp.*, 277 Va. 244, 246 (Va. 2009) (under Virginia law, an employee can manifest acceptance of an arbitration agreement through continued employment).

[15] The same is true under Pennsylvania law.  *See, e.g., Gedid v. Huntington Nat'l Bank*, No. 11-cv-1000, 2012 WL 691637, at *5 (W.D. Pa. Feb. 10 2012) (defendant "need not establish that Plaintiff actually read the Arbitration Provision...[n]or does it have to provide proof that the Arbitration Provision was actually received by Plaintiff. [Defendant] need only show that the Arbitration Provision was mailed to Plaintiff").

providing a link for accessing the Arbitration Agreement and stating that "all covered claims will be resolved through final and binding arbitration … as more fully described in the Arbitration Agreement" and that "[you should p]lease review the Arbitration Agreement and the CARE Guidebook.  It is important that you read and understand the Arbitration Agreement and the CARE Guidebook as they describe the terms, features, details of this program."  Krentzman Decl.¶ 9 & Ex. 2.  Thus, Plaintiff both had actual notice and inquiry notice of the CARE Arbitration Agreement and the expansion of mandatory arbitration under the CARE Arbitration Program.

Plaintiff had further notice of the CARE Arbitration Agreement and the expansion of mandatory arbitration under the CARE Arbitration Program because information about the new CARE Arbitration Program and links to the updated CARE Guidebook and the CARE Arbitration Agreement were posted on me@MS, and a reminder notice regarding the expansion of mandatory arbitration under CARE and the June 19, 2015 deadline for opting out was posted on me@MS throughout the opt-out period.  *Id*. ¶¶ 4, 15.  Plaintiff also participated in the weekly FAA Development team call two days after receiving the email where Mr. Drever discussed the expansion of the CARE Arbitration Program, including the May 20, 2015 email announcing the expansion of the CARE Arbitration Program, the opt-out option, and the opt-out deadline. Drever Decl. ¶¶ 24-27.

That Plaintiff had ample notice, time and opportunity to opt out if he wanted to do so is evidenced by the fact that approximately 6,611 (or 16.3%) of the Morgan Stanley employees who, like Plaintiff, received the notice of the expansion of the CARE Arbitration Program in 2015 did opt out.  Krentzman Decl. ¶ 20; *see also Hicks v. Macy's Dept. Stores, Inc*., No. 06-cv-02345, 2006 WL 2595941, at *2 (N.D. Cal. Sept. 11, 2006) ("The adequacy of Macy's notice is

further demonstrated by the ten percent of employees who received the same material as plaintiff and did opt out"). Indeed, several courts have recently enforced the CARE Arbitration Agreement that was delivered to and received and accepted by other Morgan Stanley employees under the exact circumstances present here. *See, e.g.*, *Zengotitia v. Morgan Stanley & Co., LLC*, No. 17-cv-897, Dkt. 25 (S.D.N.Y. Apr. 13, 2017); *Grant v. Morgan Stanley Smith Barney LLC*, No. 16-cv-81924, 2017 WL 1044484 (S.D. Fla. Mar. 20, 2017); *Thomas v. Morgan Stanley Smith Barney LLC, et al.*, Dkt. BC680860 (Cal. Sup. Ct. Mar, 1, 2018).

Continued employment also serves as legal consideration for Plaintiff's Arbitration Agreement, as does Morgan Stanley's mutual promise to arbitrate all statutory discrimination claims before JAMS. *Stern v. Espeed, Inc.*, No. 06-cv-958, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006) ("continuation of employment alone is sufficient consideration to enforce" arbitration agreement);[16] *Kopple v. Stonebrook Fund Mgmt., LLC*, 18 A.D.3d 329, 329 (1st Dep't 2005) ("[t]he parties' mutual promises to arbitrate constituted consideration sufficient to support the arbitration agreement").[17] Morgan Stanley's agreement that all statutory discrimination

---

[16] *See also Alexander*, 2014 WL 3952944, at *5 ("continued employment fulfills the consideration requirement for an arbitration agreement under Pennsylvania law"); *Descafano*, 2016 WL 1718677 (continued employment is sufficient consideration to uphold arbitration agreements under New Jersey law); *McNeil v. Haley S., Inc.*, No. 10-192, 2010 U.S. Dist. LEXIS 95658, at *18 (E.D. Va. Sept. 13, 2010) (continued employment constitutes sufficient consideration under Virginia law); *C. Edgar Wood, Inc. v. Clark*, 1986 Del. Ch. LEXIS 517, at *12 (Del. Ch. Jan. 21, 1986) ("continued employment …constitutes sufficient consideration to form an enforceable contract" under Delaware law).

[17] *See also Blair v. Scott Specialty Gases,* 283 F.3d 595, 603-04 (3d Cir. 2002) (under Pennsylvania law, "[w]hen both parties have agreed to … arbitration, adequate consideration exists…a contract need not have mutuality of obligation as long as [it] is supported by consideration"); *Jayasundera v. Macy's Logistics & Operations*, No. 14-cv-7455, 2015 WL 4623508, at *4 (D.N.J. Aug. 3, 2015) (interpreting New Jersey law, "sufficient consideration for the

-20-

claims would be decided by arbitration before JAMS is ample consideration for Plaintiff's

agreement to do the same since Morgan Stanley agreed to give up its right to have dispositive

motions decided by a federal court judge, its right to a jury trial, and its right to appeal under the

federal rules, rather than the FAA's more limited right of appeal.

For all the reasons stated, Plaintiff had adequate notice of, assented to, and is bound by

his Arbitration Agreement, which should be enforced according to its terms.

2.   **Plaintiff's Claims Are Covered by the CARE Arbitration Agreement
      and Are Arbitrable.**

Plaintiff's § 1981 claims are covered by the CARE Arbitration Agreement, which

expressly covers "any and all claims or disputes…arising out of or which arose out of

[employee's] employment, compensation, and terms and conditions of employment with

[Morgan Stanley]…includ[ing]… statutory discrimination, harassment and retaliation claims,

and claims under…any federal… statute."  Krentzman Decl. Ex. 3.  It is also well established

that § 1981 claims are arbitrable.  *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231 (2d Cir. 2006)

(Section 1981 claims arbitrable).  Accordingly, because Plaintiff's claims are subject to and

should be compelled to arbitration, the Court should stay these proceedings with respect to his

claims.  *Katz v. Cellco Partnership*, 794 F.3d 341, 347 (2d Cir. 2015) (Section 3 of the FAA

mandates that the Court issue a stay of proceedings when "all of the claims in an action have

been referred to arbitration" and a stay is requested).

---

arbitration agreement also exists, as the agreement mutually obliges Macy's and Plaintiff to arbitrate all employment

disputes and Plaintiff has continued his employment with Macy's"); *Csukardi v. Platinum Corral, LLC*, No. 16-cv-

00064, 2017 U.S. Dist. LEXIS 21772, at *17 (W.D. Va. Feb. 16, 2017) ("Virginia [law] is clear that a mutual

agreement to arbitrate constitutes sufficient consideration for both parties").

IV.   **CONCLUSION**.

Based on the foregoing, Defendants respectfully submit that Plaintiff had notice of, assented to, and is bound by the CARE Arbitration Agreement, and respectfully request that the Court compel arbitration of Plaintiff's claims and stay these proceedings.

Dated:  May 4, 2018                                  Respectfully submitted,

                                                     MORGAN, LEWIS & BOCKIUS LLP

                                                     By: /s/   *Andrew J. Schaffran*
                                                           Andrew J. Schaffran
                                                           Brendan T. Killeen
                                                           Nicole M. Zito

                                                     101 Park Avenue
                                                     New York, NY 10178
                                                     Tel: 212.309.6000
                                                     Fax: 212.309.6001
                                                     andrew.schaffran@morganlewis.com
                                                     brendan.killeen@morganlewis.com
                                                     nicole.zito@morganlewis.com

                                                     *Attorneys for Defendants*

-22-

## **CERTIFICATION OF COMPLIANCE**

I hereby certify that that this memoranda of law, not including the cover page, certification of compliance, table of contents, and table of authorities contains 6,945 words. I further certify that this memorandum of law complies with Section 2.D of the Individual Practices of Judge John G. Koeltl.

*/s/ Andrew J. Schaffran*
Andrew J. Schaffran

-23-

## <u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed electronically and served on all counsel of record on May 4, 2018, via the Court's ECF/CM system.

/s/ *Andrew J. Schaffran*
Andrew J. Schaffran