UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

John Lockette,

        Plaintiff,

    v.

Morgan Stanley & Co. LLC, Morgan Stanley
Smith Barney LLC, and Morgan Stanley,

        Defendants.

No.  18-cv-00876-JGK

Judge John G. Koeltl

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

Linda D. Friedman (*pro hac vice*)
Shona B. Glink (# 4051280)
STOWELL & FRIEDMAN, LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois  60606
Phone: (312) 431-0888

*Attorneys for Plaintiff*

429531

## Table of Contents

**Page**

Table of Authorities ............................................................................................................ ii

Statement of Facts ................................................................................................................1

    A.  Morgan Stanley Rehires Lockette Without Requiring Him to Arbitrate. ...........................2

    B.  Morgan Stanley Tries to Force Lockette to Waive His Right to Litigate Discrimination Claims in Court. .......................................................................3

    C.  Only 1.2% of Employees Initially Opt Out of the Arbitration Proposal. ...........................6

    D.  Morgan Stanley Fails to Notify Class Counsel of the Arbitration Proposal. .....................7

    E.  Morgan Stanley Claims CARE Benefits While Denying Them to Lockette......................7

    F.  Morgan Stanley's Motion Rests on the Testimony of Alleged Wrongdoers......................8

Argument .............................................................................................................................9

I.     Enforcing the Arbitration Agreement in This Case Would Undermine the Purposes of the FAA. .............................................................................9

    A.  Lockette Never Received or Assented to the Arbitration Proposal. ..................................11

    B.  Morgan Stanley's Email Failed to Give Adequate Notice of the Arbitration Proposal........................................................................14

        1.  The Single Email Was Inadequate. ............................................................................14

        2.  The Email Was Misleading.........................................................................................17

II.    Plaintiff Opted Out of the Arbitration Proposal. .................................................19

III.   The Proposed Arbitration Agreement Is Void for Lack of Consideration.........................19

IV.   The Arbitration Proposal Is Unlawful Under FINRA Rules .............................................20

Conclusion .........................................................................................................................22

## Table of Authorities

**Cases**

*Alakozai v. Chase Inv. Servs. Corp.*, 557 F. App'x 658 (9th Cir. 2014) ...................................... 21

*Alexander v. Raymours Furn. Co.*, No. 13-cv-5387, 2014 WL 3952944 (E.D. Pa. Aug. 13, 2014) ................................................................................................................................. 18

*Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) ............................................................ 9

*Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22 (S.D.N.Y. 2010)............................................... 10

*AT&T Techns., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643 (1986) ....................................... 9

*Bensadoun v. Jobe-Riat*, 316 F.3d 171 (2d Cir. 2003) .................................................................. 10

*Buchman v. Weiss*, No. 08-cv-5453, 2009 WL 2044615 (S.D.N.Y. July 15, 2009).................... 18

*Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546 (1st Cir. 2005) ................. 14, 16, 17

*Carlisle Med. Grp., LLC v. Eldohiri*, No. 1:15-cv-2367, 2017 WL 783433 (M.D. Pa. Mar. 1, 2017) ................................................................................................................................. 18

*Cedeno v. Morgan Stanley Smith Barney, LLC*, 154 F. Supp. 3d 1318 (S.D. Fla. 2016)............. 17

*Clearfield v. HCL Am. Inc.*, No. 17-cv-1933, 2017 WL 2600116 (S.D.N.Y. June 5, 2017)........ 18

*Descafano v. BJ's Wholesale Club, Inc.*, No. 15-cv-7883, 2016 WL 1718677 (D.N.J. Apr. 28, 2016) ................................................................................................................................ 18

*DuBois v. Macy's E. Inc.*, 2007 WL 3193169, *aff'd*, 338 F. App'x 32 (2d Cir. 2009) ............... 18

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018)............................................................................ 9

*Grant v. Morgan Stanley Smith Barney LLC*, No. 16-cv-81924, 2017 WL 1044484 (S.D. Fla. Mar. 20, 2017) .............................................................................................................. 16

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013)....................... 11

*Gupta v. Morgan Stanley Smith Barney, LLC*, No. 17-cv-8375, 2018 WL 2130434 (N.D. Ill. May 9, 2018) .................................................................................................... passim

*Hudyka v. Sunoco, Inc.*, 474 F. Supp. 2d 712 (E.D. Pa. 2007)............................................... 14, 16

*Ins. Co. v. Young's Adm'r*, 90 U.S. 85 (1874) ................................................................................. 9

*Jillian Mech. Corp. v. United Service Workers*, 882 F. Supp. 2d 358 (E.D.N.Y. 2012).............. 10

*Manigault v. Macy's E., LLC*, 506 F. Supp. 2d 156, *rev'd*, 318 F. App'x 6 (2d Cir. 2009) ......... 18

*Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169 (2d Cir. 2006) ...................... 19, 20

*NASDAQ OMX Group, Inc. v. UBS Secs., LLC*, 770 F.3d 1010 (2d Cir. 2014).......................... 21

*Pelligrino v. Morgan Stanley Smith Barney LLC*, No. 17-cv-7865, 2018 WL 2452768 (S.D.N.Y. May 31, 2018)............................................................................................... 16

*PNC Bank Nat'l Ass'n v. Balsamo*, 634 A.2d 645 (Pa. Super. 1993).......................................... 20

*Quiles v. Fin. Exchange Co.*, 879 A.2d 281 (Pa. Super. 2005) ............................................. 10, 18

429531

*Rightnour v. Tiffany & Co.*, 239 F. Supp. 3d 744 (S.D.N.Y. 2017) ...................................... passim

*Schmell v. Morgan Stanley & Co.*, No. 17-cv-13080, 2018 WL 1128502 (D.N.J. Mar. 1, 2018) ....................................................................................................... 10, 13, 15, 16

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) ...................................................... 9, 14

*Specht v. Netscape Comm'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) ........................................... 10, 19

*Thomas v. Morgan Stanley Smith Barney LLC*, Dkt. BC680860 (Cal. Sup. Ct. Mar. 1, 2018) .................................................................................................................................. 16

*Weinstein v. Jenny Craig Operations, Inc.*, 17 N.Y.S.3d 407 (N.Y. App. Div. 2015) ................ 19

*Zengotita v. Morgan Stanley & Co.*, No. 17-cv-0897 (S.D.N.Y. Apr. 13, 2017) ......................... 16

**Statutes**

9 U.S.C. § 1 *et seq.* ................................................................................................................... 9, 11, 12

**Other Authorities**

1 WILLISTON ON CONTRACTS § 4:16 .............................................................................................. 9

FINRA Rule 2263(2) .................................................................................................................... 2

Katherine V.W. Stone and Alexander J.S. Colvin, *The Arbitration Epidemic: Mandatory Arbitration Deprives Workers and Consumers of Their Rights*, ECONOMIC POLICY INSTITUTE (Dec. 7, 2015) ......................................................................................... 22

429531

**Introduction**

Defendants (collectively "Morgan Stanley" or the "Firm") move to compel Plaintiff John Lockette to arbitrate his claims of race discrimination and retaliation based on a single misleading email the Firm sent to thousands of employees just before a holiday weekend. Morgan Stanley's motion should be denied for at least three reasons.

First, Lockette did not assent to the arbitration proposal. He never received the email and knew nothing about the arbitration proposal until long after Morgan Stanley fired him. Even if Lockette had received the email – and he did not – it deliberately obscured the fact that he would be required to arbitrate discrimination claims. Second, class counsel representing Lockette in a race discrimination class action opted out of the arbitration proposal on his behalf as soon as they learned of it. Third, the arbitration proposal lacks consideration and constitutes an unlawful attempt to evade the rules (incorporated in the proposal) of Morgan Stanley's self-regulatory organization, the Financial Industry Regulatory Authority ("FINRA").

**Statement of Facts**

The Equal Employment Opportunity Commission ("EEOC") and several classes of minority and women employees have repeatedly sued Morgan Stanley and its predecessors since the 1970s. (Dkt. 1 ¶¶ 6-9.) The Firm resolved these lawsuits by paying tens of millions of dollars and promising in consent decrees and class action settlements to reform its discriminatory practices and improve employment opportunities for minorities and women. (*Id.*) As a result, Morgan Stanley has been subject to court supervision for decades. (*Id.*) Rather than responding to the litigation by reforming its business practices to provide equal opportunity to employees, in 2015, Morgan Stanley embarked on a secret campaign to strip its employees of the right to file public lawsuits and to sue collectively. (*Id.* ¶ 10.) As explained below, the secretive manner in

which Morgan Stanley executed its policy change undermines the Federal Arbitration Act's

goals of reducing the burden on federal courts and providing a less expensive and more

expeditious dispute resolution process for employees.

**A.      Morgan Stanley Rehires Lockette Without Requiring Him to Arbitrate.**

Lockette, an African American, joined Defendants' predecessor Smith Barney as a

financial advisor ("FA") in 2001. (Lockette Decl. ¶ 4.) Lockette was promoted to Regional

Planning Specialist in 2007, but two years later Morgan Stanley merged with Smith Barney and

laid off Lockette in a reduction in force that disproportionately targeted minority managers. (*Id.*)

In the fall of 2013, Morgan Stanley had no African American Regional Training Officers across

the firm and, therefore, hired Lockette to fill that token role. (*Id.* ¶ 5.)

As a registered employee of FINRA member Morgan Stanley, Lockette was required to

sign a Form U4 that incorporated FINRA's rules stating that discrimination claims – unlike most

other employment claims – need not be arbitrated. (*Id.* ¶ 13.) Pursuant to FINRA Rule 2263(2),

incorporated into the Form U4 Lockette signed, Morgan Stanley informed Lockette that:

> A claim alleging employment discrimination ... is not required to be arbitrated
> under FINRA rules. Such a claim may be arbitrated at FINRA only if the parties
> have agreed to arbitrate it, either before or after the dispute arose.

(*Id.*; Glink Decl., Ex. K.) Lockette also signed his offer letter, which "constitutes the entire

understanding and contains a complete statement of all agreements between you and Morgan

Stanley." (Dkt. 13-1 at 5.) The offer letter contains no agreement to arbitrate discrimination

claims, and Lockette did not enter into any arbitration agreement with Morgan Stanley. (Dkt. 13-

1.)

Throughout his employment, Morgan Stanley subjected Lockette to a concerted

campaign of race discrimination. When Lockette complained to manager Scott Drever, Drever

429531

(a) knowingly issued false and discriminatory evaluations of Lockette's performance that contradicted objective performance measures, (b) referred Lockette's complaints to Human Resources ("HR"), which did nothing, and (c) ultimately fired Lockette. (Dkt. 1 ¶¶ 32-33, 35-38.) Then HR's Jessica Krentzman purported to investigate Lockette's complaint that his termination was retaliatory, but upheld the Firm's action. (*Id.* ¶ 39.)

**B.      Morgan Stanley Tries to Force Lockette to Waive His Right to Litigate
          Discrimination Claims in Court.**

From at least 2009 through 2015, Morgan Stanley's CARE program expressly permitted all registered employees like Lockette to litigate discrimination claims in court, but also gave them the option of arbitration. (Dkt. 14 ¶ 3; Dkt. 14-1 at 3-4, 9-10.) But in May 2015, Morgan Stanley embarked on a campaign to insulate itself from discrimination lawsuits in general and class actions in particular. (Dkt. 14-3 (mandatory arbitration agreement and class action waiver).)

Morgan Stanley claims that after the close of business on May 20, 2015 (the Wednesday before Memorial Day), its HR Department sent a mass emailing to 15,656 employees, including Lockette, with the reassuring subject line, "Expansion of CARE Arbitration Program." (Dkt. 14-2; Glink Decl., Ex. A.) Before that date, Lockette had already made numerous complaints of discrimination to HR and management, including Drever. (Lockette Decl. ¶ 14.) If Lockette had received and read the email and understood he would be waiving his right to litigate discrimination claims in court, he would have opted out of the arbitration proposal. (*Id.*)

Lockette never received or saw the email until long after Morgan Stanley fired him. (*Id.* ¶ 12.) Morgan Stanley (which has exclusive access to Lockette's email inbox) has presented no evidence that the May 20, 2015 email reached his inbox, let alone that Lockette opened the email or clicked on hyperlinks to the arbitration proposal and CARE guidebook. (*See* Dkt. 13 and 14; *Gupta v. Morgan Stanley Smith Barney, LLC*, No. 17-cv-8375, 2018 WL 2130434, at *3 (N.D.

429531

Ill. May 9, 2018) (rejecting Morgan Stanley's argument that proof of sending email equated to proof of receipt).) Indeed, despite repeated requests, Morgan Stanley was unable to produce a copy of the May 20, 2015 email from the inbox that Morgan Stanley assigned Lockette during his employment or provide any evidence that the Firm located that email in Lockette's inbox.  (Glink Decl. ¶ 16.) Instead, in August 2017, two months after a failed mediation of Lockette's claims, Morgan Stanley sent Lockette's counsel a "reproduction" of the email the Firm claims it sent to Lockette. (*Id.*)

Even if Lockette had received or seen the email, nothing in the subject line indicated the message was important, time-sensitive, or required action. (Dkt. 14-2.) The email was neither flagged as important nor sent with a request to acknowledge receipt. (*Id.*) Morgan Stanley sent no follow-up or reminder emails alerting Lockette to the upcoming deadline for opting out, and did not request or require any acknowledgment that Lockette had read or assented to the arbitration proposal. (Dkt. 14.) The content of the email downplayed its significance and steered registered employees like Lockette away from reading further, by explaining that the "expansion" of CARE solely affected non-registered employees:

> Current registered employees are required to arbitrate most workplace claims under existing FINRA rules, and ... Morgan Stanley is announcing the expansion of CARE ... to extend arbitration obligations for all US employees – registered and non-registered. Effective June 19, 2015, ... all covered claims between the Firm and employees will be resolved through final and binding arbitration on a non-class, non-collective and non-representative action basis....

(Dkt. 14-2.) By reminding registered employees they were already obliged to arbitrate "most" employment claims – which "under existing FINRA rules" meant all but discrimination claims – and then stating that the "expansion of CARE" would extend arbitration obligations to non-registered employees, the email strongly suggested that nothing would change for registered employees like Lockette, who would remain subject to the pre-2015 arbitration program:

4

optional for discrimination claims, mandatory for other claims. (*Id.*; Glink Decl., Ex. M.) Morgan Stanley reinforced this misimpression by failing to explain that "covered" claims would now include "discrimination" claims in a reversal of the Firm's prior policy allowing employees to bring such claims in court. (*Id.*)

Morgan Stanley did not send Lockette the arbitration proposal or attach it to the email. (Dkt. 14 ¶ 6.) Instead, to access the proposal and guidebook describing the program, employees were required to click on hyperlinks that would take them out of the email and into a Firm intranet containing the voluminous documents. (*Id.*) The arbitration proposal and guidebook in turn directed employees to search various third-party websites, including those of FINRA and JAMS, to locate multiple sets of rules containing the standards and procedures for arbitrating discrimination claims. (Dkt. 14-3 at 3-4; Dkt. 14-4 at 4-5.)

If an employee disregarded the email's implicit message that only non-registered employees would be affected by the CARE expansion and located the two sets of rules on the JAMS website, he would have been further confused by JAMS's Employment Arbitration Rules & Procedures, which state that an arbitration based on a "post-dispute Arbitration Agreement" cannot be commenced without an agreement "fully executed by all Parties." (Glink Decl., Ex. C, Rule 5(a)(i).) The employee could well conclude that no arbitration of existing discrimination claims would be required unless he or she signed such an agreement.

Morgan Stanley claims (at 7) it posted a reminder notice about the arbitration proposal and opt-out deadline on its intranet site. Lockette did not see any such reminder. (Lockette Decl. ¶ 20.) Morgan Stanley usually announced important or time-sensitive information during a special conference call led by an HR representative or by an email requiring a read receipt or other affirmative acknowledgment of receipt. (*Id.*) Lockette is not aware of any such

429531

communication accomplished solely via intranet posting, a single email, or both. (*Id.*) Employees were neither expected nor required to check the intranet on a regular or routine basis, and like most, Lockette did so only rarely. (*Id.*)

**C.      Only 1.2% of Employees Initially Opt Out of the Arbitration Proposal.**

Morgan Stanley misleadingly claims (at 8) that "more than 6,600 employees" opted out of the arbitration agreement in 2015. But Morgan Stanley failed to inform the Court that, of the 15,656 employees who allegedly received the email announcement in May 2015, only **186** (or **1.2%**) opted out. (Glink Decl., Ex. A.) Morgan Stanley reluctantly disclosed this information as part of the limited discovery Plaintiff requested. (*Id.* ¶ 3.) The percentage of employees opting out of the arbitration agreement skyrocketed to **27.8%** in September 2015 (*id.*, Ex. A), when news of Morgan Stanley's attempt to force employees into secret arbitrations of their discrimination claims leaked to the press and began appearing in an online industry newsletter, AdvisorHub. (*Id.* ¶ 5, Ex. B (articles dated Sept. 21 and 24 and Oct. 1, 2015).) To Plaintiff's knowledge, Morgan Stanley has not disclosed these opt-out percentages in any of the other cases nationwide in which employees are challenging the enforceability of Morgan Stanley's arbitration agreement. And those percentages are understated because they do not include employees covered by the class-wide opt-outs submitted by class counsel in *Jaffe v. Morgan Stanley & Co.*, No. 06-cv-3903 (N.D. Cal.), and two other class actions, which Morgan Stanley does not acknowledge as valid. (Glink Decl., Exs. A, E-G.)

Plaintiff does not know how many employees actually received, read, and understood the Firm's email and reviewed the hyperlinked arbitration proposal and guidebook, whether in May 2015 or later. If Morgan Stanley knows, it is not disclosing that information. But one need not speculate whether employees in the May group had a fair opportunity to make an informed

decision about the arbitration proposal. They did not. The stark contrast between the 1.2% opt-out rate for the May group (who could not have seen any external publications) and the 27.8% opt-out rate for the September group (when Morgan Stanley's secretive attempts to force employees into arbitration were reported in a trade newsletter) is too large a disparity to ignore. The disparity shows that, when some employees read the industry press reports and learned of the arbitration proposal, the opt-out rate increased more than 23-fold. Put another way, 97.2% of the opt-outs occurred after the program became less secretive.

**D.    Morgan Stanley Fails to Notify Class Counsel of the Arbitration Proposal.**

At the time Morgan Stanley claims to have sent the email to Lockette, Lockette was a member of the certified class in *Jaffe,* a class action challenging Morgan Stanley's discrimination against African American and Latino FAs. (Glink Decl. ¶ 8.) Morgan Stanley resolved the *Jaffe* class action by agreeing to a settlement with injunctive relief that remained in effect from October 1, 2010 through September 30, 2017. (Dkt. 1 ¶ 9.)

To Plaintiff's knowledge, Morgan Stanley never informed *Jaffe* class counsel that the expansion of the CARE arbitration program or the opt-out deadline would apply to Lockette. (Glink Decl. ¶ 9.) Upon learning this, *Jaffe* class counsel promptly opted out on behalf of all *Jaffe* class members, including Lockette. (*Id.*, Ex. E.) Class counsel in two other class actions also opted out of the arbitration proposal on behalf of African American and female FAs. (*Id.*, Exs. F-G.)

**E.    Morgan Stanley Claims CARE Benefits While Denying Them to Lockette.**

Morgan Stanley never treated Lockette as covered by the CARE arbitration program until he filed this lawsuit. Before filing this action, Lockette attempted to resolve the dispute with Morgan Stanley through a mediation sponsored by JAMS. (Glink Decl. ¶ 15.) According to the

CARE guidebook, Morgan Stanley was required to (a) give Lockette a Request for Mediation form, (b) review the form and notify Lockette whether his dispute was eligible for mediation, and (c) pay all "administrative fees and expenses," including "mediator and facilities fees," "associated with mediation under CARE." (*Id.*, Ex. H at MS 2, 7, 9.) Morgan Stanley did none of these things. (*Id.* ¶ 15; Lockette Decl. ¶ 24.) Indeed, Morgan Stanley required Lockette to pay 50% of the mediation fees, which amounted to more than $5,000. (Glink Decl., Ex. I.)

**F.      Morgan Stanley's Motion Rests on the Testimony of Alleged Wrongdoers.**

In support of its motion to compel Lockette to arbitrate his discrimination claims, Morgan Stanley submitted the declarations of Jessica Krentzman and Scott Drever – both of whom the complaint identifies as wrongdoers. (Dkt. 1 ¶¶ 32-39.) Krentzman's declaration is conspicuously silent about whether Lockette's email inbox contained the May 20, 2015 email, and, if so, whether the email had been opened or the hyperlinks accessed. (Dkt. 14 ¶ 5.) Nor does Krentzman state whether the Firm received any "bounceback" email or other indication that it was not delivered. (*Id.*) Instead, Krentzman states only that Morgan Stanley sent the email to Lockette (along with 15,655 others) on May 20, 2015; that the Firm did not receive an out-of-office reply message; and that Lockette was not on a leave of absence during the opt-out period. (*Id.*)

Drever claims in his declaration that he discussed the proposed arbitration agreement and the opt-out deadline during the weekly Financial Advisor Associate ("FAA") Development team conference call that Lockette purportedly attended on May 22, 2015, the Friday afternoon before Memorial Day. (Dkt. 13 ¶ 24.) Lockette does not recall whether he participated in that conference call, but he categorically denies that Drever ever discussed the arbitration proposal with him at any time during his employment at Morgan Stanley. (Lockette Decl. ¶¶ 16-19.) More

429531

than a dozen employees attended these weekly conference calls, which covered the same operational topics and rarely involved HR or administrative matters, other than those specifically related to the training program. (*Id.* ¶ 17.) If Drever had discussed the arbitration program or opt-out deadline during one of these calls, Lockette would have remembered it. (*Id.* ¶ 19.)[1]

<u>Argument</u>

## I.   Enforcing an Arbitration Agreement in This Case Would Undermine the Purposes of the FAA.

Congress enacted the Federal Arbitration Act in order to promote a method of resolving disputes that is quicker, more efficient, and less expensive than court litigation. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). Arbitration is fundamentally a matter of contract. *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). Essential to any contract is "mutual assent, the meeting of the minds of both parties." *Ins. Co. v. Young's Adm'r*, 90 U.S. 85, 107 (1874). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techns., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation omitted). "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 121 (2d Cir. 2012) (quoting 1 WILLISTON ON CONTRACTS § 4:16).

Under the Federal Arbitration Act, an agreement to arbitrate a preexisting dispute – like this one, where the plaintiff complained of race discrimination before the agreement took effect – is enforceable only if there is "an agreement in writing." 9 U.S.C. § 2. Moreover, as then-Circuit

---

[1] Morgan Stanley submitted no declarations from other conference call attendees, only heavily redacted handwritten notes that Drever claimed were his agenda for the conference call (Dkt. 13-4). Rather than a meeting agenda, these unredacted notes are doodles about birthdays, tasks to be performed, and other random subjects and carry the wrong date of "5/21." (Glink Decl., Ex. J.)

Judge Sotomayor explained, arbitration and other agreements formed through electronic communications have two "essential" threshold requirements: "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Specht v. Netscape Comm'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002); *Quiles v. Fin. Exchange Co.*, 879 A.2d 281, 287 (Pa. Super. 2005) (arbitration "agreements are upheld only where it is clear that the parties have agreed to arbitrate in [a] clear and unmistakable manner.").

Morgan Stanley argues at length (at 10-14) that New York law should determine whether Lockette assented to the arbitration proposal, largely because the Firm is headquartered in New York. Plaintiff disagrees, because he worked and maintained his office and business address in Pennsylvania and lived in New Jersey. *See Schmell v. Morgan Stanley & Co.*, No. 17-cv-13080, 2018 WL 1128502, at *2 (D.N.J. Mar. 1, 2018) ("In this action involving a New Jersey citizen employed in one of Defendant's New Jersey offices, New Jersey contract law governs whether Plaintiff is bound to arbitrate."). But as Morgan Stanley concedes (at 14 n.11), the result in this case would be the same "regardless of which state's law applies." Accordingly, the Court may rely on decisions construing the laws of Pennsylvania (where Lockette was employed), New Jersey (where Lockette resided), as well as New York (where Morgan Stanley is headquartered). *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 30 n.5 (S.D.N.Y. 2010).

Morgan Stanley bears the burden of establishing that it adequately notified Lockette of the arbitration proposal and received his unambiguous assent to it. *Jillian Mech. Corp. v. United Service Workers*, 882 F. Supp. 2d 358, 364 (E.D.N.Y. 2012). In deciding these issues, the Court should apply "a standard similar to that applicable for a motion for summary judgment," construing the facts in favor of Plaintiff and according him the benefit of all reasonable inferences. *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Rightnour v. Tiffany &*

10

429531

*Co.*, 239 F. Supp. 3d 744, 749 (S.D.N.Y. 2017). If there are questions of fact about whether an arbitration agreement was formed, Plaintiff is entitled to a trial. 9 U.S.C. § 4; *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013); *Rightnour*, 239 F. Supp. 3d at 749.

### A. Lockette Never Received or Assented to the Arbitration Proposal.

Morgan Stanley has not met its burden of showing it gave Lockette adequate notice of the terms of the arbitration agreement and received Lockette's unambiguous assent. Lockette disputes both of these points. (Lockette Decl. ¶¶ 11-24.) Morgan Stanley claims (at 5-6) it sent *and Lockette received* an email containing a hyperlink to the agreement after the close of business on May 20, 2015. Lockette denies receiving the email or knowing anything about it or the proposed arbitration agreement. (*Id.* ¶¶ 11-12.) Morgan Stanley, which has exclusive access to Lockette's work email inbox, pointedly submits no proof that the May 20, 2015 email arrived in Lockette's inbox or that Lockette opened the email, much less clicked on any of the hyperlinks embedded in the email. (*See* Dkt. 14 ¶ 5.)

Morgan Stanley controlled the mode and timing of its offer of mandatory arbitration for discrimination claims. It could have ensured Lockette received the proposed agreement by emailing it to him or mailing it to his home or office address via certified mail. It could have flagged the email as important or indicated that in the subject line. To ensure it did not end up in a spam folder instead of the inbox, the Firm could have sent the email with a delivery or read receipt or required Lockette to acknowledge receiving the email. It could have required Lockette to sign the agreement, either manually or electronically. Morgan Stanley did none of those things. Instead of a fair offer to change the terms of employment, the Firm sent a mass, "drive-by" email to 15,656 employees after the close of business and just before the Memorial Day

11

holiday weekend. Then just before the Labor Day weekend, the Firm sent another mass email to 21,076 employees. (Glink Decl., Ex. A.) Confirming its "gotcha" strategy, Morgan Stanley refused to accept the timely opt-outs it received on behalf of thousands of employees from class counsel in three different class actions. (*Id.*, Exs. E-G.)

As a result, instead of adjudicating the merits of civil rights and other cases, this Court – along with federal courts around the country – must conduct satellite litigation to determine whether employees should be bound by an arbitration proposal referenced in an email they never received or read. *See Gupta*, No. 17-cv-8375, Dkt. 27 (scheduling jury trial "on issue of making of agreement to arbitrate"). Predictably, other courts have applied different approaches to the formation issue, at times reaching inconsistent results. *Id.*; Dkt. 12 at 26. Employees who do not prevail will be forced to arbitrate their claims before being allowed to appeal the formation of an arbitration agreement. 9 U.S.C. § 16(b). Nothing could be further from the quick, efficient, and inexpensive dispute resolution Congress intended in enacting the FAA. Nor can Morgan Stanley's "gotcha" strategy be reconciled with the FAA's guiding principle that arbitration must be a matter of mutual consent.

In an attempt to bolster its case that Lockette had notice of the arbitration proposal, Morgan Stanley relies on (a) Drever's claim to have discussed it and the opt-out deadline with Lockette and others during a conference call (Dkt. 13 ¶ 24), and (b) an alleged intranet posting described in (but not attached to) the Krentzman declaration (Dkt. 14 ¶ 15). Lockette vigorously disputes these allegations. (Lockette Decl. ¶¶ 16-20.) Moreover, the complaint identifies both of these declarants as wrongdoers – Drever for discriminating and retaliating against Lockette in evaluating and ultimately firing him, and Krentzman because she was responsible for investigating Lockette's complaints of discrimination. (Dkt. 1 ¶¶ 32-39; Dkt. 14 ¶ 22.) It would

be improper to accept the word of Morgan Stanley's declarants to the extent they are contradicted by Lockette's declaration.

Judges have reviewed more compelling evidence and still rejected Morgan Stanley's claim that an employee received the mass email announcing the expanded CARE program. *E.g.*, *Gupta*, 2018 WL 2130434, at *3. In *Gupta*, a Morgan Stanley paralegal submitted a declaration stating she had located the CARE program email in Gupta's inbox. *Id.* She also admitted the Firm could not determine whether Gupta actually opened the email, although she reported that Gupta had received and responded to other emails on the same day. *Id.* The court nevertheless rejected Morgan Stanley's claim to have established receipt of the email, noting that the Firm's evidence – including a declaration by Ms. Krentzman similar to the one submitted here – had established merely that the email was sent, not that it was received. *Id.* That result is even more warranted here, where Morgan Stanley has failed to locate or produce from Lockette's inbox the May 20 email (or any other emails sent or received on that day).

Because Morgan Stanley has not met its burden, the motion to compel arbitration should be denied. But if there were any doubt about the resolution of the motion, the Court should conduct a trial on the disputed issues of fact or consider them after full discovery, because "there is a genuine dispute regarding whether [Lockette] received the relevant e-mail [from Morgan Stanley] and thus whether an agreement to arbitrate was formed." *Id.* at *3; *accord Schmell*, 2018 WL 1128502, at *3-4 (finding "genuine dispute of material fact as to" notice and mutual assent to Morgan Stanley arbitration proposal where employee lacked "recollection of receiving, viewing, or opening the September 2, 2015 email or accessing the me@MS site"). "[W]ithout evidence that [Lockette] ever followed the link [to the arbitration proposal] contained in" the sole email Morgan Stanley sent him, "continuing to work after the date" of that email "cannot

constitute the kind of 'conduct which evinces the intention of the parties to contract.'" *Rightnour*, 239 F. Supp. 3d at 751 (internal citations omitted).

**B.   Morgan Stanley's Email Failed to Give Adequate Notice of the Arbitration Proposal.**

Even if the Court overlooked Lockette's declaration and found he received the email, there is no evidence that Lockette assented to an arbitration agreement. The single email was misleading and failed to disclose essential terms of the actual arbitration proposal, which was *not* sent to Lockette. (Dkt. 14-2.)

**1.   The Single Email Was Inadequate.**

As a closely analogous decision held, "an employee cannot validly agree to arbitrate his claims unless he has been advised of the arbitration terms." *Hudyka v. Sunoco, Inc.*, 474 F. Supp. 2d 712, 716 (E.D. Pa. 2007). In *Hudyka*, Sunoco's head of HR sent an email to employees announcing a new dispute resolution program. *Id.* at 714. The email promised that an explanatory booklet had been posted on the firm's intranet, and Sunoco claimed the email contained a link to the booklet. *Id.* at 714-15. As with Morgan Stanley's email, nothing about Sunoco's email "announce[d] that the message was important and affected employees' rights." *Id.* at 716.  As here, the Sunoco email failed to disclose key terms of the arbitration agreement. *Id.* at 717. The court held there was "no arbitration agreement to enforce" because "Sunoco did not adequately communicate [its] essential terms" and, therefore, Hudyka could not have accepted them. *Id.* at 716.

In refusing to compel arbitration, both *Hudyka* and the Second Circuit in *Schnabel* relied on a First Circuit decision on facts similar to this case. *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546 (1st Cir. 2005). The *Campbell* employer sent an email to all employees that contained links to an arbitration agreement and explanatory brochure on the company's intranet,

429531

but did not inform employees they would be required to arbitrate their federal statutory claims or were waiving their right to a jury trial. *Id.* at 547-48. The employer proved that Campbell opened the email two minutes after it was sent, but not whether he clicked on the links to review the agreement or brochure. *Id.* at 548-49. Analyzing the "totality of the circumstances," including "the method of communication, the workplace context, and the content of the communication," the court held the single email with hyperlinks did not adequately notify employees of the arbitration agreement, given that the employer had never before used this method to communicate "a *contractual* term that was to become a condition of continued employment." *Id.* at 555-56 (emphasis in original).

Other courts have reached the same conclusion. *Schmell*, 2018 WL 1128502, at *3; *Gupta*, 2018 WL 2130434, at *3; *Rightnour*, 239 F. Supp. 3d at 751. Indeed, *Schmell* and *Gupta* involved the same Morgan Stanley email, CARE guidebook, and arbitration proposal at issue in this case. In *Schmell*, as here, Morgan Stanley relied on declarations by Krentzman and documentation that the email was sent to Schmell. *Schmell*, 2018 WL 1128502, at *3. Schmell declared he had "no recollection of receiving, viewing, or opening the September 2, 2015 email or accessing the me@MS site." *Id.* The court found "a genuine dispute of material fact as to whether he was on notice of the agreement to arbitrate such that there was a meeting of the minds and he could mutually assent to the terms of the CARE program." *Id.* at *4. Similarly, the *Gupta* court found that the plaintiff's denial that he received the email created a genuine dispute as to "whether an agreement to arbitrate was formed." *Gupta*, 2018 WL 2130434, at *3.

Morgan Stanley disregards *Schmell* and *Gupta* and claims instead (at 20) that three other courts have enforced an arbitration agreement "under the exact circumstances present here." Not so. The *Schmell* court distinguished *Grant v. Morgan Stanley Smith Barney LLC*, No. 16-cv-

429531

81924, 2017 WL 1044484 (S.D. Fla. Mar. 20, 2017), on grounds that apply equally to this case: Grant, unlike Lockette and Schmell, admitted "*seeing* but not *reading* the email." *Schmell*, 2018 WL 1128502, at *3 n.2 (emphasis in original). Moreover, Grant never opted out, and the court ruled only after a lengthy evidentiary hearing that included testimony from Grant and Krentzman. In *Zengotita v. Morgan Stanley & Co.*, No. 17-cv-0897 (S.D.N.Y. Apr. 13, 2017), the plaintiff did not deny receiving the email, and he never opted out. The court in *Thomas v. Morgan Stanley Smith Barney LLC*, Dkt. BC680860 (Cal. Sup. Ct. Mar. 1, 2018), found that Thomas "agreed to arbitrate, or declined to opt out," on "4 separate occasions." *See also Pelligrino v. Morgan Stanley Smith Barney LLC*, No. 17-cv-7865, 2018 WL 2452768, at *5 (S.D.N.Y. May 31, 2018) (plaintiff never opted out and, unlike Lockette's offer letter, Pelligrino's employment agreement expressly acknowledged the CARE program contained terms of employment).

More compelling rationale was presented in *Rightnour*, in which the Court refused to assume that multiple emails containing a hyperlink to an arbitration agreement adequately notified the employee of the agreement, where the employer failed to "produce[] any evidence that Rightnour 'clicked through' to the online module." 239 F. Supp. 3d at 751. This Court held that, "without evidence that Rightnour ever followed the link contained in those emails, continuing to work after the date that those emails were received cannot constitute the kind of 'conduct which evinces the intention of the parties to contract.'" *Id.* This reasoning applies with more force here, where Morgan Stanley relied on a single, misleading email to notify Lockette that he would be forced to arbitrate discrimination claims.

Like the employers in *Hudyka*, *Campbell*, *Schmell*, *Gupta*, and *Rightnour*, Morgan Stanley failed to give Lockette adequate notice of the terms of the arbitration proposal. Here, as

429531

in *Rightnour*, Morgan Stanley chose to send Lockette an email containing hyperlinks instead of attaching the proposed agreement. In this case, as in *Campbell*, Morgan Stanley departed from its usual practice and relied on a single email – without appropriate flags, subject lines, or reminder emails – to notify employees they would be waiving important legal rights by continuing their employment. *Campbell*, 407 F.3d at 556. Departing from its usual practice, Morgan Stanley chose not to require any acknowledgment that Lockette received the email or the arbitration proposal, even though Morgan Stanley requires customers to sign a form acknowledging receipt of their arbitration agreement. *See Cedeno v. Morgan Stanley Smith Barney, LLC*, 154 F. Supp. 3d 1318, 1320-21 (S.D. Fla. 2016).

## 2. The Email Was Misleading.

A document as ambiguous and misleading as Morgan Stanley's email cannot form the basis of a binding arbitration agreement. Even if Lockette had received the email, it never explained how the new CARE program differed from the old except in falsely implying that the changes affected only non-registered employees. In order to figure out what the Firm was changing, Lockette would have been required not only to retrieve the arbitration proposal and CARE guidebook from the Firm's intranet, but also to obtain the 2009 CARE guidebook and to search the FINRA and JAMS websites for their pertinent rules. And having obtained those documents, Lockette would have had the daunting task of trying to reconcile their inconsistencies. For example, the arbitration proposal states that employment discrimination claims must be arbitrated "under the auspices and rules of JAMS," but one of the referenced JAMS rules states that a "post-dispute Arbitration Agreement" cannot be enforced unless "fully executed by all Parties." (Glink Decl., Ex. C.) The arbitration agreement also incorporates FINRA rules, which prohibit the Firm from forcing registered employees to waive their right to a

17

FINRA forum. (Glink Decl., Ex. N.)

Because Morgan Stanley did not adequately inform Lockette of the terms of the arbitration proposal, his conduct did not manifest assent to it. *See, e.g.*, *Quiles*, 879 A.2d at 287-88 (holding employee who never received arbitration proposal but signed form referencing it could not have assented to arbitration agreement); *Carlisle Med. Grp., LLC v. Eldohiri*, No. 1:15-cv-2367, 2017 WL 783433, at *3 (M.D. Pa. Mar. 1, 2017) (holding employer must ensure actual receipt of handbook to establish contract formation).

Finally, Morgan Stanley cites a string of cases[2] (at 14-19) to claim its single email blast was sufficient to strip Lockette of his right to vindicate his civil rights in court. But these cases demonstrate precisely the opposite: arbitration agreements will be upheld only when employers can prove they fairly and adequately notified their employees. Morgan Stanley relies heavily on two unpublished summary orders, *DuBois v. Macy's E. Inc.,* 2007 WL 3193169, *aff'd*, 338 F. App'x 32, 33 (2d Cir. 2009), and *Manigault v. Macy's E., LLC*, 506 F. Supp. 2d 156, *rev'd*, 318 F. App'x 6, 7 (2d Cir. 2009). But instead of relying on a single email, in both cases, Macy's

---

[2] Nearly all of these cases involved more than a single email notice; most involved actual receipt and signature. *E.g.*, *Descafano v. BJ's Wholesale Club, Inc.*, No. 15-cv-7883, 2016 WL 1718677, at *3 (D.N.J. Apr. 28, 2016) (plaintiff signed form acknowledging receipt of hard-copy packet containing arbitration agreement, explanatory documents, and opt-out form); *Alexander v. Raymours Furn. Co.*, No. 13-cv-5387, 2014 WL 3952944, at *2, 5 (E.D. Pa. Aug. 13, 2014) (plaintiff admitted accepting offer after acknowledging review of revised handbook, including arbitration agreement); *Buchman v. Weiss*, No. 08-cv-5453, 2009 WL 2044615, at *1 (S.D.N.Y. July 15, 2009) (plaintiff signed partnership agreement containing arbitration clause); *see also Clearfield v. HCL Am. Inc.*, No. 17-cv-1933, 2017 WL 2600116, at *2 (S.D.N.Y. June 5, 2017) (noting "e-mail at issue was prominently titled 'Important announcement'" and plaintiff never opted out).

18

mailed information about its new mandatory arbitration policy to employees' homes, after an informational campaign and mandatory employee meetings (attended by plaintiff in one case). *DuBois*, 2007 WL 3193169, at \*1-2 (E.D.N.Y. July 13, 2007); *Manigault*, 506 F. Supp. 2d 156, 157-58 (E.D.N.Y. 2007). Macy's also gave employees a second opt-out period. *Manigault*, 506 F. Supp. 2d at 158.  Moreover, in *Manigault*, "the parties fully litigated the issue of receipt," and the court found that Macy's mailed its materials in accordance with regular office procedures, unlike Morgan Stanley in this case. 318 F. App'x at 6-7.

Even if Lockette had received the email, allegedly sent just before the Memorial Day holiday, it was not intended to and did not give employees "reasonably conspicuous notice" of the waiver of their rights. *Specht*, 306 F.3d at 35. Lacking reasonable notice, Lockette did not manifest his assent to the arbitration proposal by continuing to show up for work. *Id.*; *Rightnour*, 239 F. Supp. 3d at 751.

## II.    Plaintiff Opted Out of the Arbitration Proposal.

Morgan Stanley improperly failed to inform Lockette's court-appointed counsel about the arbitration proposal. *See Weinstein v. Jenny Craig Operations, Inc.*, 17 N.Y.S.3d 407, 408 (N.Y. App. Div. 2015) (denying enforcement of signed arbitration agreements sent to employees without informing them of putative class action). As soon as *Jaffe* class counsel learned of the proposed agreement, they opted out on behalf of Lockette and the entire class on October 2, 2015. (Glink Decl., Ex. E.) Under these circumstances, it would be inequitable to allow Morgan Stanley to ignore class counsel's opt-out on Lockette's behalf.

## III.    The Proposed Arbitration Agreement Is Void for Lack of Consideration.

The formation of a valid, enforceable contract requires consideration. *Murray v. Northrop Grumman Info. Tech., Inc.,* 444 F.3d 169, 178 (2d Cir. 2006). "A valuable consideration consists

429531

in some right, interest or benefit to one party or some loss, detriment or responsibility resulting to the other party" in exchange for the agreement. *PNC Bank Nat'l Ass'n v. Balsamo*, 634 A.2d 645, 655 (Pa. Super. 1993). Morgan Stanley offers (at 20) the parties' mutual promises to arbitrate disputes and Lockette's continued employment, but neither constitutes valid consideration in this case.

First, Morgan Stanley's purported promise to arbitrate its claims against Lockette is illusory. Under FINRA rules, Morgan Stanley already was obliged to arbitrate all its claims against registered employees like Lockette. (Glink Decl., Ex. L.) The expansion of CARE to mandate arbitration of employment discrimination claims applies only to claims by Lockette, not claims by the Firm. No statute authorizes an employer to sue its employee for employment discrimination in the workplace. Accordingly, the only claims Morgan Stanley promises to bring in arbitration are those the Firm already was bound to arbitrate. "A promise to perform a pre-existing legal obligation does not amount to consideration." *Murray*, 444 F.3d at 178.

Second, continued employment cannot qualify as consideration for an arbitration agreement because Morgan Stanley admitted that Lockette's decision to accept or reject the agreement would have no effect on his continued employment. (Dkt. 14 ¶ 8.) Having promised Lockette the same right to continued at-will employment *regardless* of whether he opted out of the arbitration proposal, the Firm offered no consideration for the agreement. *See PNC Bank*, 634 A.2d at 655.

## IV.   The Arbitration Proposal Is Unlawful Under FINRA Rules.

Morgan Stanley is a member of FINRA, the self-regulatory organization that governs the financial services industry. (*See* Dkt. 14-1 at 4.) Morgan Stanley's email, arbitration proposal, and guidebook all reference and incorporate FINRA rules governing arbitration. The email

20

429531

begins by stating, "Current registered employees are required to arbitrate most workplace claims under existing FINRA rules[.]" (Dkt. 14-2 at 2.) The arbitration proposal and guidebook incorporate FINRA rules and note that "Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org)." (Dkt. 14-3 at 3-4 and n.1; Dkt. 14-4 at 4-5 and n.3.) Both the arbitration proposal and the guidebook expressly disclaim any intent to modify the FINRA Arbitration Rules. (Dkt. 14-3 at 4 n.3; Dkt. 14-4 at 9 n.6.)

Nevertheless, Morgan Stanley attempts to circumvent FINRA rules by trying to force registered employees like Lockette to forego their right to the FINRA arbitration forum. The arbitration proposal states that all employment discrimination claims must be arbitrated at JAMS instead of FINRA. (Dkt. 14-3 at 4.) But FINRA's Regulatory Notice No. 16-25 unequivocally prohibits member firms like Morgan Stanley from requiring registered employees to arbitrate in a non-FINRA forum. (Glink Decl., Ex. N at 1, 6-7.) Accordingly, Morgan Stanley is barred by the rules of its own self-regulatory organization, incorporated into the arbitration proposal, from forcing registered employees like Lockette to arbitrate their claims at JAMS. *See NASDAQ OMX Group, Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1034 (2d Cir. 2014) (holding that parties did not intend to arbitrate claims precluded by rules of self-regulatory organization that were incorporated into arbitration agreement); *Alakozai v. Chase Inv. Servs. Corp.*, 557 F. App'x 658 (9th Cir. 2014).

Morgan Stanley has several strategic reasons for trying to force employees to arbitrate at JAMS. Empirical research shows that employees are far less likely to win in arbitration than in litigation, and when they do win, they recover on average just a fraction of the damages awarded in court suits. Katherine V.W. Stone and Alexander J.S. Colvin, *The Arbitration Epidemic: Mandatory Arbitration Deprives Workers and Consumers of Their Rights* at 20, ECONOMIC

21

429531

POLICY INSTITUTE (Dec. 7, 2015). Some arbitrators candidly admit that arbitration favors "repeat players" like Morgan Stanley. *Id.* at 22-23. But employees forced to arbitrate their disputes before JAMS, as opposed to FINRA, face additional impediments. A summary of each FINRA arbitration award is reported online. But JAMS is a private, for-profit entity that allows arbitration awards to remain secret. Morgan Stanley has access to any arbitration awards against it in similar discrimination cases, but no employee has access to that information, and "[n]o arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration[.]" (Dkt. 14-3 at 4.) The Court should reject Morgan Stanley's attempt to force Lockette's discrimination claims into a secret, one-sided arbitration.

## Conclusion

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Morgan Stanley's motion or, in the alternative, schedule full discovery and a trial to determine whether Plaintiff received adequate notice of and assented to the arbitration proposal.

Respectfully submitted on behalf of Plaintiff,


By:     */s/ Linda D. Friedman*

429531

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this memorandum, excluding the cover page, this certificate of compliance, and the tables of contents and authorities, contains 6848 words. I further certify that this memorandum complies with Section 2.D of the Individual Rules of Practice of Judge John G. Koeltl.

*/s/ Shona B. Glink*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served upon all counsel of record via CM/ECF on July 6, 2018.

/s/ Shona B. Glink

429531