USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: __10-3-18__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN LOCKETTE

                    Plaintiff,                    18-cv-876 (JGK)

        - against -

MORGAN STANLEY, ET AL.,                    MEMORANDUM OPINION
                                           AND ORDER
                    Defendants.

JOHN G. KOELTL, District Judge:

     The defendants — Morgan Stanley, Morgan Stanley Smith

Barney LLC, and Morgan Stanley & Co. LLC — have moved to compel

the plaintiff, John Lockette, to arbitrate his claims of racial

discrimination and retaliation against them. At issue is whether

the parties entered into a validly formed and enforceable

arbitration agreement. For the reasons explained below, the

defendants' motion to compel arbitration and stay this case is

**granted.**

                              I.

     The following facts are undisputed except where noted.

     The plaintiff joined the defendants' Philadelphia,

Pennsylvania office in 2013 as a Regional Training Officer.

Lockette Decl. ¶ 5; Drever Decl. ¶ 15. Upon joining the

defendants' firm, the plaintiff signed an offer letter, which

made no mention of an arbitration agreement, and a "Form U4"

containing a predispute resolution clause explaining the

Financial Industry Regulatory Authority's ("FINRA") arbitration rules. See Drever Decl. Ex. 1; Glink Decl. Ex. K. As to employment discrimination, the form provided:

> A claim alleging employment discrimination . . . in violation of a statute is not required to be arbitrated under FINRA rules. Such a claim may be arbitrated at FINRA only if the parties have agreed to arbitrate it, either before or after the dispute arose. The rules of other arbitration forums may be different.

Glink Decl. Ex. K.

The defendants, however, had their own internal employee dispute resolution program entitled "CARE" (Convenient Access to Resolutions for Employees). Krentzman Decl. ¶ 3. The iteration of CARE in effect when the plaintiff joined the defendants' firm took effect in November 2009 and ran until June 2015. Id. This version of CARE and an explanatory guidebook were posted on the firm's intranet site. Id. The intranet site was available to all employees and contained a variety of general-employment and human-resources information. Id. The guidebook explaining the 2009-2015 CARE program stated:

> If you are a current or former employee who was registered at any time during your employment with Morgan Stanley and you wish to pursue a statutory employment discrimination claim[,] . . . you may, (1) proceed to arbitration, through (a) the arbitration forums administered by JAMS or AAA, if Morgan Stanley agrees, or (b) a self-regulatory organization(SRO), such as FINRA, or (2) go to court. For all other employment claims, registered employees will continue to be required to submit their claims to binding arbitration as required by their Form U-4 Agreement.

Id. Ex. 1 at 9–10. Therefore, registered employees had the option of pursuing employment discrimination claims through arbitration by various alternative-dispute-resolution services or by filing suit in court. The 2009-2015 CARE Guidebook also explained:

> **Changes to CARE**
>
> Upon notice, the terms of CARE may change or be discontinued. Any material changes made to CARE will be announced in advance of their effective dates and will then become equally binding upon you and the Firm. In the event of such a change, pending claims will be governed by the Program in effect at the time of filing of the Request for Mediation/Arbitration Form(s) with the Program Administrator.

Id. Ex. 1 at 14.

In 2015, the defendants announced that CARE would be expanded to make arbitration of all covered claims – including employment discrimination claims – mandatory for all employees, including registered employees; registered employees could no longer pursue covered claims in court. Id. ¶ 4. Beginning on May 20, 2015, the defendants notified employees of the expansion of the CARE program through an email to each employee's individualized work email account. Id. ¶¶ 4, 14. The emails were sent in waves, but the plaintiff was included in the first wave of emails, sent out on May 20, 2015. Id. ¶¶ 4, 10-12. The email's subject line read, "Expansion of CARE Arbitration Program," and its body, in relevant part, provided:

Current registered employees are required to arbitrate most workplace claims under existing FINRA rules, and given the success of the CARE program, Morgan Stanley is announcing the expansion of CARE and modifications to related Firm policies and programs to extend arbitration obligations for all US employees – registered and non-registered. Effective June 19, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a nonclass, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook. Please review the Arbitration Agreement [hyperlink] and CARE Guidebook [hyperlink] . . . .

**Next Steps**

By continuing your employment with Morgan Stanley, you accept and agree to, and will be covered and bound by the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook, unless you elect to opt out of the CARE Arbitration Program by completing, signing and submitting an effective CARE Arbitration Program Opt-Out Form [hyperlink] by June 19, 2015. . . . If you remain employed and do not timely complete, sign and submit an effective CARE Arbitration Program Opt-Out Form, the Firm's records will reflect that you have consented and agreed to the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook. . . .

Your decision to opt out of the Arbitration Agreement and the CARE Arbitration Program will not adversely affect your employment status with the Firm.

If you have questions about the Arbitration Agreement or the arbitration provisions in the CARE Guidebook, email carebox@morganstanley.com.

Id. Ex. 2 at 1-2. Thus, the email notified employees that (1)

starting June 19, 2015, all employees – including registered

employees – would be required to arbitrate all covered claims[1]

through the CARE program; (2) unless an employee chose to opt

out of CARE, the employee's continued employment would serve as

a manifestation of assent to the program; and (3) employees

could opt out by timely submitting an opt-out form.[2]

The plaintiff claims that he neither received nor saw the

email until well after he was terminated in August 2016.

Lockette Decl. ¶ 12. And even if he had, the plaintiff argues,

the email was misleading and otherwise inadequate to provide

notice of the defendants' changes to CARE. Thus, the plaintiff

contends that, under either theory, no valid agreement to

arbitrate his claims was formed. Further, the plaintiff adds

that any agreement to the CARE expansion was void for a lack of

consideration, and that he opted out of CARE through his

involvement in a related class-action suit. None of these

arguments are persuasive.

## II.

Under 9 U.S.C. § 4, "a district court must enter an order

to arbitrate upon being satisfied that the making of the

agreement for arbitration or the failure to comply therewith is

---

[1] "Covered claims" were defined in the new arbitration agreement linked in the email. See Krentzman Decl. Ex. 3 at 1. There is no dispute that the claims in this case are "covered claims."

[2] Information about the new CARE program and links to the updated CARE Guidebook were also posted on the defendants' intranet site. Krentzman Decl. ¶ 4.

not in issue." Moses H. Cone Mem'l Hosp. v. Mercury Constr.
Corp., 460 U.S. 1, 22 n.27 (1983) (quotation marks omitted). A
court faced with a motion to compel arbitration and stay
proceedings pending arbitration in a case covered by the Federal
Arbitration Act has four tasks: "first, it must determine
whether the parties agreed to arbitrate; second, it must
determine the scope of that agreement; third, if federal
statutory claims are asserted, it must consider whether Congress
intended those claims to be nonarbitrable; and fourth, if the
court concludes that some, but not all, of the claims in the
case are arbitrable, it must then decide whether to stay the
balance of the proceedings pending arbitration." Lewis Tree
Serv., Inc. v. Lucent Techs., Inc., 239 F. Supp. 2d 332, 335-36
(S.D.N.Y. 2002) (internal citation omitted), abrogated on other
grounds by Katz v. Cellco P'ship, 794 F.3d 341 (2d Cir. 2015);
see Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d
Cir. 1987). Only the first task is at issue here.

　　　"The determination of whether parties have contractually
bound themselves to arbitrate a dispute — a determination
involving interpretation of state law — is a legal conclusion."
Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir.
2002). In answering that question, "the court applies a standard
similar to that applicable for a motion for summary judgment. If
there is any issue of fact as to the making of the agreement for

6

arbitration, then a trial is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). "A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by 9 U.S.C. § 4." Manning v. Energy Conversion Devices, Inc., 833 F.2d 1096, 1103 (2d Cir. 1987).

"Arbitration clauses are a matter of contract law and, if valid, should be enforced." DuBois v. Macy's E. Inc., 338 F. App'x 32, 33 (2d Cir. 2009) (summary order). "[T]he ultimate question of whether the parties agreed to arbitrate is determined by state law." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002). Thus, "[w]hen deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see also Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 749-50 (S.D.N.Y. 2017).

## III.

### A.

Because state contract law governs whether the parties agreed to arbitrate, it is first necessary to determine which

state's law applies. As confirmed at oral argument, the parties

do not dispute that New York law applies.[3]

### B.

The agreement to arbitrate must be proved by a

preponderance of the evidence. Progressive Cas. Ins. Co. v. C.A.

Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir.

1993). "To form a valid contract under New York law, there must

be an offer, acceptance, consideration, mutual assent and intent

to be bound." Register.com, Inc. v. Verio, Inc., 356 F.3d 393,

427 (2d Cir. 2004) (quotation marks omitted). Mutual assent need

not be signified in writing; "[t]he manifestation or expression

of assent necessary to form a contract may be by word, act, or

conduct which evinces the intention of the parties to contract."

Id. (emphasis removed) (quotation marks omitted). Under New York

law, "[a]n employee may consent to a modification to the terms

of employment by continuing to work after receiving notice of

the modification." Manigault v. Macy's E., LLC, 318 F. App'x 6,

8 (2d Cir. 2009) (summary order); see Isaacs v. OCE Bus. Servs.,

---

[3] If it were disputed which state's law applied, and there were a
conflict between the law of New York and that of the states whose laws might
apply, then under New York's choice of law rules the Court would determine
"which state has the most significant relationship to the transaction and the
parties." Specht v. Netscape Commc'ns Corp., 150 F. Supp. 2d 585, 590 & n.7
(S.D.N.Y. 2001), aff'd, 306 F.3d 17 (2d Cir. 2002). The plaintiff's original
employment contract was governed by New York law. See Drever Decl. Ex. 1 at
4. Moreover, the defendants' headquarters are in New York, and the plaintiff
worked often in New York in addition to Pennsylvania and New Jersey. Compl.
¶ 2; Drever Decl. ¶ 19. Therefore, New York law would apply.

Inc., 968 F. Supp. 2d 564, 571 (S.D.N.Y. 2013) ("Under New York law, employee handbook revisions are binding when an employee continues to work after receiving notice of the revisions."). In such a circumstance, the employee's continued employment serves as an "objective manifestation[]" of the employee's intent to be bound. See Rightnour, 239 F. Supp. 3d at 750-52.

New York law, moreover, contains a presumption that a party has received an email when it is delivered to the party's email address in accordance with regular office procedures. See Clearfield v. HCL Am. Inc., No. 17cv1933, 2017 WL 2600116, at *2 (S.D.N.Y. June 15, 2017); see also Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985). To rebut this presumption, a plaintiff must produce admissible evidence showing that the email was not sent or was not received. Cf. Weiss v. Macy's Retail Holdings, Inc., No. 17-2219, 2018 WL 3409143, at *3 (2d Cir. July 12, 2018) (summary order) (holding that the plaintiff defeated New York's mailing presumption by "provid[ing] evidence of his family's regular procedure for reviewing with him the mail he received and assert[ing], with sworn support, that the relevant mailings did not arrive and go through that process"). But a plaintiff's mere denial of receipt of an email is insufficient. Clearfield, 2017 WL 2600116 at *2.

Here, the plaintiff contends that he and the defendants could not have formed a valid agreement because he did not

9

receive the defendants' May 20, 2015, email noticing the changes
to the CARE program. But New York's email presumption prevails.
The plaintiff offers only a mere denial of receipt, a litany of
more efficacious means by which the defendants could have issued
its CARE-expansion proposal, and a case applying Illinois
contract law in concluding that the plaintiff's denial of
receipt of an email created a genuine dispute of fact, see Gupta
v. Morgan Stanley Smith Barney, LLC, No. 17cv8375, 2018 WL
2130434 (N.D. Ill. May 9, 2018). None of these grounds are
sufficient to rebut the presumption. Further, the defendants
provide evidence that the email was addressed and delivered to
the plaintiff's assigned email account, was not located in his
SPAM folder, and did not trigger a "bounceback" email indicating
it was not delivered or undeliverable. Krentzman Decl. ¶ 5 & Ex.
2; Waggoner Decl. ¶¶ 3-7 & Ex. 1. The defendants have also
produced emails sent by the plaintiff dated May 22, 2018,
indicating that the plaintiff was actively using his email
account around the time of the May 20 email. See Drever Decl.
Ex. 3. The evidence therefore establishes that the plaintiff
received the email.

   The plaintiff next contends that the email did not provide
sufficient notice of the essential terms of the defendants'
offer. This argument also fails. The email's subject line,
"Expansion of CARE Arbitration Program," clearly indicated its

content. And the content itself conspicuously notified employees that: (1) all covered claims by employees – including registered employees such as the plaintiff – would be subject to mandatory arbitration; (2) unless employees opted out of CARE, their continued employment would be considered assent to the program; and (3) they could opt out by submitting a form before the program's effective date. The email also contained hyperlinks to the new arbitration agreement and CARE Guidebook. This is sufficient notice of the defendants' offer and its terms. See Pelligrino v. Morgan Stanley Smith Barney LLC, No. 17cv7865, 2018 WL 2452768, at *3 (S.D.N.Y. May 31, 2018) ("These facts – particularly, that Morgan Stanley sent the relevant email to Plaintiff, that the email provided a way to opt out of the expanded program, and that Plaintiff did not so opt out – compel the conclusion that Plaintiff is bound by the Arbitration Agreement and the CARE Guidebook's arbitration provisions in light of various principles of New York law." (quotation marks omitted)); Clearfield, 2017 WL 2600116 at *2; cf. Meyer v. Uber Techs., Inc., 868 F.3d 66, 78 (2d Cir. 2017) ("That the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice.").[4]

---

[4] Although Meyer involved application of California law, "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" 868 F.3d at 74 (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012)).

Each case the plaintiff cites to the contrary is distinguishable. See Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 556-57 (1st Cir. 2005) (noting that the defendant did not typically use email to handle personnel matters and that the email in question did not state directly that the relevant policy "contained an arbitration agreement that was meant to effect a waiver of an employee's right to access a judicial forum"); Gupta, 2018 WL 2130434 (applying Illinois law); Schmell, 2018 WL 1128502 (applying New Jersey law and not noting an email presumption similar to that under New York law); Rightnour, 239 F. Supp. 3d at 750-53 (involving a misleading email and a plaintiff's written objection to the defendant's offered arbitration program); Hudyka v. Sunoco, Inc., 474 F. Supp. 2d 712 (E.D. Pa. 2007) (applying Pennsylvania law in a case involving a nondescriptive email subject line, no essential terms in the email's body, and no hyperlink to a page explaining the defendant's arbitration program).

Finally, the plaintiff argues that the email is misleading and that he and the defendants therefore could not have entered into a valid agreement. The plaintiff points to the following language, contending that it downplayed the significance of the changes to the CARE program and read as if the changes applied to only nonregistered employees:

Current registered employees are required to arbitrate most workplace claims under existing FINRA rules, and . . . Morgan Stanley is announcing the expansion of CARE . . . to extend arbitration obligations for all US employees — registered and non-registered. Effective June 19, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a nonclass, non-collective and non-representative action basis . . . .

The email is not misleading. Its text clearly conveys that registered employees, who once were required to arbitrate "most" claims, would now be required to arbitrate "all" covered claims. The email also contained hyperlinks to pages providing and explaining the new CARE program's terms and an email address to which questions could be sent.

In sum, under New York law the evidence establishes that the plaintiff received the email, and the email adequately set forth the essential terms of the defendants' expansion of the CARE program. Moreover, the email provided convenient ways — through hyperlinks and an email address for employees to direct questions — for the plaintiff to inquire about the changes to the CARE program.

### C.

The plaintiff next argues that any purported agreement between the defendants and him is void for a lack of consideration.

13

However, continued employment generally serves as legal consideration sufficient to enforce an arbitration agreement. See Stern v. Espeed, Inc., No. 06cv958, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006). This is because "in at-will employment the employer has the right to discharge the employee . . . without cause, and without being subject to inquiry as to his or her motives, [and] forbearance of that right is a legal detriment which can stand as consideration for a restrictive covenant." Zellner v. Stephen D. Conrad, M.D., P.C., 589 N.Y.S.2d 903, 907 (App. Div. 1992) (citation omitted). Thus, once the plaintiff continued his employment, the defendants chose to forgo their right to terminate him without cause and provided the requisite consideration.[5]

### D.

Finally, the plaintiff summarily asserts that he opted out of the defendants' arbitration proposal by virtue of his membership in the certified plaintiff class in Jaffe v. Morgan Stanley & Co., No. 06cv3903 (N.D. Cal.).[6] In that case, class

---

[5] The plaintiff also claims that FINRA Rule 13200 requires the defendants to arbitrate claims by registered employees solely before FINRA and points out that the CARE program requires certain claims by registered employees, including employment discrimination claims, to be arbitrated before JAMS, a non-FINRA dispute-resolution service. But in Credit Suisse Securities (USA) LLC v. Tracy, the Court of Appeals for the Second Circuit held that "[FINRA] Rule 13200 does not prohibit the enforcement of pre-dispute waivers of a FINRA arbitral forum." 812 F.3d 249, 257 (2d Cir. 2016). The CARE program therefore does not violate FINRA Rule 13200 by requiring some claims to be arbitrated before JAMS.

[6] The plaintiff also mentions – but does not state that he was a part of – two other class-action suits in which class counsel opted out of the

counsel opted out of the defendants' CARE program on October 2, 2015, on behalf of the entire class. But the Jaffe class consisted of "African-Americans and Latinos employed as Financial Advisors or Registered Financial Advisor Trainees in the Global Wealth Management Group of Morgan Stanley & Co. Incorporated or its predecessor, Morgan Stanley DW Inc. at any time between October 12, 2002 and December 3, 2007." Jaffe v. Morgan Stanley & Co., No. 06cv3903, 2008 WL 346417, at *3 (N.D. Cal. Feb. 7, 2008). The plaintiff does not claim to have ever been employed as such. Rather, the plaintiff claims to have worked at Smith and Barney until its merger with Morgan Stanley in 2009. Lockette Decl. at ¶ 4. In any event, the opt out for the Jaffe class came months after the defendants' opt-out deadline and was therefore ineffective.[7]

---

defendants' CARE program, Augst-Johnson v. Morgan Stanley & Co., No. 06cv1142 (D.D.C.), and Frazier v. Morgan Stanley & Co., No. 16cv804 (S.D.N.Y.). The plaintiff would not have qualified for the subject classes in those cases.

[7] Although it is unclear from the plaintiff's brief, he appears to argue that the defendants' deadline does not apply because the defendants improperly failed to inform the Jaffe class counsel about their CARE-expansion proposal. The plaintiff thus maintains that it would be inequitable not to enforce the class-wide opt out as applied to him. But the plaintiff does not explain why the defendants' failure to notify the class counsel was improper. And the lone authority the plaintiff cites, Weinstein v. Jenny Craig Operations, concerns a defendant who, unlike here, "implemented its new arbitration agreement on the very day the [relevant] litigation was commenced." 17 N.Y.S.3d 407, 408 (App. Div. 2015). Accordingly, the court held that

> [g]iven the authority granted to the [trial] court to protect putative class members and the fairness of the process, the court properly exercised its discretion by drawing the inference that the agreements had been implemented in response to this litigation and to preclude putative class members. Thus, the court properly

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to compel arbitration is **granted**. This case is stayed pending the conclusion of the arbitration. The Clerk of Court is directed to close this case on the active docket of the Court subject to reinstatement depending on any developments in the arbitration.

SO ORDERED.

Dated:     New York, New York
             October 3, 2018

                                      John G. Koeltl
                      United States District Judge

---

declined to enforce those agreements signed after commencement of this litigation.

Id. (citations omitted). Here, the plaintiff has raised no issues of fact similar to those in Weinstein.